# UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ ) | |
| **Lowry Martin** ) | |
| 10204 Pine Meadows Lane ) | |
| Upper Marlboro, Maryland 20772 ) | |
|  ) | |
| Plaintiff, ) | Civil Action No. |
| v. ) | |
|  ) | |
| **The Arc of the District of Columbia** ) | **JURY TRIAL DEMANDED** |
| 900 Varnum Street, N.E. ) | |
| Washington, D.C. 20017-2950 ) | |
|  ) | |
| Defendant. ) | |
| _____ ) | |

## COMPLAINT

### JURISDICTION

Jurisdiction is vested in this Court pursuant to The False Claims Act, 31 U.S.C. §§ 3729-3733.

Jurisdiction is also vested in this Court, pursuant to pendant jurisdiction, since the same allegations in this complaint that constitute violations of the The False Claims Act, 31 U.S.C. §§ 3729-3733, also constitute violations of the D.C. Whistleblower Protection Act, DC Code §1-615.53, as well as the D.C. common law claim of breach of contract and the tort of intentional infliction of emotional distress.

### VENUE

Venue lies in this judicial district, pursuant to 28 U.S.C. 1391(e) because this claim arose in the judicial district of the District of Columbia.

### A.   PARTIES

The Defendant Arc of the District of Columbia (hereinafter, the "Arc"), is a non-profit 501(c)(3) membership organization established to serve persons with mental retardation and related developmental disabilities and their families in the District of Columbia. The Arc , D.C., was formerly known as the D.C. Association for Retarded Citizens.  (**Exhibit A**, pamphlet entitled "The Arc of D.C.").

The Arc receives both funding from both the federal and District of Columbia governments for the purpose assisting persons with mental retardation obtain and maintain gainful employment.

The Arc receives funding from the United States government, the Department of Health and Human Services, Medical Assistance Administration, under a Medicaid Waiver Contract, for the purpose of carrying out its mission of implementing a job conversion program intended to train and

place persons with mental retardation in appropriate employment.

The Arc receives funding from the government of the District of Columbia, MRDDA, Mental Retardation and Developmental Disabilities Administration, for the purpose of carrying out its mission of implementing a job conversion program intended to train and place persons with mental retardation in appropriate employment.

The Arc's funding contract with the United States Department of Health and Human Services, Medical Assistance Administration, under a Medicaid Waiver Contract, includes a provision that requires The Arc to hire job coaches who have at least one year of experience as job coaches and who are qualified to coach persons with mental retardation to perform the duties of jobs that are available to them.

The Arc's funding contract with the District of Columbia, MRDDA, Mental Retardation and Developmental Disabilities Administration contract, includes a provision that requires The Arc to hire job coaches who have at least one year of experience as job coaches and who are qualified to coach persons with mental retardation to perform the duties of jobs that are available to them.

Ms. Mary Lou Meccariello is the Executive Director of The Arc.

Mr. Thomas Dempsey is the Director of Business Operations of The Arc.

Ms. Meccariello hired Plaintiff, Ms. Lowry Anita Martin, to assume the position of Employment/Marketing Development Specialist, by letter dated October 7, 2003 (**Exhibit B**), on behalf of The Arc of the District of Columbia. Ms. Martin was employed by The Arc from October 27, 2003 to Friday, July 16, 2004, 2004, as the Arc's Employment/Marketing Development Specialist.

## SUMMARY OF CLAIMS

The Arc terminated Ms. Martin two days after she filed a grievance, dated July 14, 2004, regarding the conduct of another employee, Ms. Annetta Graham, which consisted of unprofessional behavior, vulgar insults and failure to perform her duties for an Arc client.

In her grievance, in a meeting called by Arc management in response to her Grievance, Ms. Martin specified that the Arc was not providing qualified job coaches or appropriate job coaching and training, as required under its government funding contracts.

Pursuant to its funding requirements, the Arc is required to hire job coaches that have at least one year of prior experience as job coaches.

The Arc had hired no job coaches who had at least one year of prior experience as job coaches.

The Arc's written Personnel Policies, § 9.1-9.2, include a Grievance procedure. **(Exhibit**

C)

Pursuant to its own Grievance Procedure and its progressive discipline policy, The Arc was obligated to process Ms. Martin's grievance and investigate her claims. **(Exhibit C)**

The Arc breached its employment contract with Ms. Martin by refusing to process Ms. Martin's Grievance or to investigate the claims in her Grievance.

In a July 16, 2004 meeting called in response to Ms. Martin's grievance, Ms. Meccariello chastised Ms. Martin for comments in her Grievance, indicating that the Arc was not providing its clients with the services required under its government funding agreements.

On or about July 16, 2004, Ms. Meccariello admonished Ms. Martin for raising the issue, in her grievance, that The Arc was not providing proper employment evaluations of clients, job training or job coaching, in accordance with its obligations under its funding contracts with the federal and D.C. governments.

On or about July 16, 2004, Ms. Meccariello chastised Ms. Martin for purportedly discussing another Arc employee's neglect of her duties with an outside funding agent.

On or about July 16, 2004, Ms. Meccariello told Ms. Martin never to speak to a funding agent about the operations of the Arc.

On or about July 16, 2004, Ms. Meccariello terminated Ms. Martin and accused her of not being a "team player."

The Arc terminated Ms. Martin out of fear that Ms. Martin would "blow the whistle" on The Arc by reporting its non-compliance with its contractual funding obligations to the federal and D.C. government funding agencies.

**Facts Constituting Causes of Action against ARC**

The Arc hired Ms. Martin as an Employment Marketing Specialist, also known as the "Coordinator, Job Development Activities for Conversion Model."

The Arc hired Ms. Martin to place persons with mental retardation (hereinafter, "clients") in gainful employment.

The Arc is required, pursuant to its contracts with the federal and D.C. government, to assist clients, through job coaching and other assistance, so that they can function independently in these jobs.

When Ms. Martin was interviewed by Ms. Meccariello, Ms. Meccariello specifically stated that The Arc needed a "mover and a shaker" to implement the job conversion program intended to train and place persons with mental retardation in appropriate employment.

Ms. Meccariello hired Ms. Martin for the express purpose of soliciting new employers to

participate in the placement of persons with mental retardation into their workplaces.

Ms. Martin's job description at The Arc (**Exhibit D**) required her to perform the following tasks:

a) Oversees and coordinates job development activities of conversion model, maintaining appropriate communication and documentation with staff leadership and job developers.

b) In coordination with program staff, conducts interviews with participants to determine program eligibility, personal employment interests, skills and abilities an conducts career counseling where needed.

c) Conducts discussion groups to prepare participants for actual employment experiences and job placement as part of the weekly Job Club.

d) Identifies employment and training sites and establishes relationships with potential employers and implements employer tax credit programs.

e) Performs an analysis of work environment and job requirements for potential job match.

f) Obtains necessary police clearance, birth certificate, social security card and other necessary date for employment from program staff.

g) Maintains employer files and completes all necessary reports, as stipulated in program contracts.

h) Participates in program related meetings and conferences.

i) Conducts regular site visits to employment related meetings and conferences.

j) Conducts regular site visits to employment locations to ensure placement success and transitions support to job developers and coaches.

k) Helps prepare job applications, resumes and marketing materials with program staff

l) Schedules and transports individuals to job interviews.

m) Conducts training at employment sites while developing natural support networks.

n) Coordinates the collection of data and information relating to job performance, work behavior and socialization skills with other job developers and coaches.

o) Represents the Arc in external forums and committees as requested by the Supervisor.

While employed by The Arc, Ms. Martin performed all of the duties of her position, as described in paragraph # 31, above.

While employed by The Arc, Ms. Martin solicited employers to obtain positions for ARC clients, placed ARC clients in gainful employment and assisted ARC clients with job coaching,

4

transportation and other serves to assist them in maintaining gainful employment.

Prior to Ms. Martin's employment with The Arc, absolutely no ARC clients had been placed into jobs.

During the time that Ms. Martin was employed by The Arc, Annetta Graham was also an employee ARC, managing staff providing all services to clients.

Ms. Martin had to perform the duties neglected by Ms. Graham, in order to prevent The Arc's client, "Milton,"[1] from losing the job that Ms. Martin had just secured for him.

Ms. Graham made an error regarding the starting date of the position for a client, Milton, and therefore failed to provide transportation for Milton to his new job, as was necessary in order for Milton to secure and perform the job.

Due to Ms. Graham's failure to provide necessary services to another client, "Cartina," Ms. Martin also provided transportation to Cartina, using her own personal vehicle, although it was not within her normal job duties to provide for a client for regular work attendance. Had Ms. Martin not provided this transportation, Cartina would have lost the job opportunity.

In addition to providing transportation for Cartina to and from work for a full work-week and part of the following week, Ms. Martin also performed the duties of "job coach" for Cartina during that time, awaiting The Arc's assignment of a qualified job coach to assist Cartina.

Ms. Martin attempted to discuss with Ms. Graham the to transportation and job coaching problems caused by the confusion with respect to Milton's starting date for his new position.

Ms. Graham responded to Ms. Martin's inquiry by dismissing her with the words, "F--k you, Lowry."

Ms. Martin responded to Ms. Graham by stating, "Now, Annetta, how unprofessional is that?"

---

[1] The client's last name is omitted to protect the client's privacy in public records; however, the client's full name will be provided to the Court, under seal, as appropriate.

5

Ms. Graham had a practice of harassing Ms. Martin and thwarting Ms. Martin's ability to place clients in jobs and otherwise perform her job.

Ms. Graham scheduled a meeting in Ms. Martin's absence and did not inform her of the meeting, although Ms. Martin was a necessary party to the meeting. Ms. Martin alleged that Ms. Graham's failure to tell Ms, Martin about the meeting nearly cost an ARC client a job.

On or about July 14, 2004, Ms. Martin filed a Grievance with The Arc (**Exhibit E),** pursuant to The Arc's Grievance Procedures.

Ms. Martin filed a Step 1 Grievance, pursuant to the written Grievance procedure, on July 14, 2004. In her four-page grievance, Ms. Martin alleged that Annetta Graham committed misconduct. (**Exhibit E**) The actions alleged constituted both simple and gross misconduct by Ms. Graham, under Arc's stated discipline policies, §§10.2.1 and 10.2.2. (**Exhibit C**)

In her July 14, 2004 Grievance, Ms. Martin included allegations that Ms. Graham committed misconduct. (**Exhibit E**) The actions alleged constituted failure to perform her duties, in violation of § 10.2.1, defining "simple misconduct." (**Exhibit C**)

In her July 14, 2004 Grievance, Ms. Martin alleged that Ms. Graham committed specific acts that constituted neglect of persons served by The Arc. (**Exhibit E**) The abuse of persons described, including verbal harassment, violation of § 10.2.1 of the Arc's Personnel Policy, defining "gross misconduct." (**Exhibit E).**

In her July 14, 2004 Grievance, Ms. Martin alleged that she had to perform the duties neglected by Ms. Graham, in order to prevent a client from losing a job.

In her July 14, 2004 Grievance, Ms. Martin alleged that Ms. Graham scheduled a meeting in her absence and did not inform her of the meeting, although Ms. Martin was a necessary party to the meeting. Ms. Martin alleged that Ms.

6

Graham's failure to tell Ms, Martin about the meeting nearly cost a client a job.

In her July 14, 2004 Grievance, Ms. Martin alleged that, when Ms. Martin attempted to discuss with Ms. Graham her neglect of an ARC client, with respect to transportation and job coaching, Ms. Graham refused to address the issues and instead, replied only, "F--k you, Lowry." Ms. Martin's grievance alleges that she responded to Ms. Graham by stating, "Now, Annetta, how unprofessional is that?"

In her July 14, 2004 Grievance, Ms. Martin, Ms. Martin alleged that Ms. Graham had a practice of harassing her and thwarting her ability to place clients in jobs and otherwise perform her job.

In response to her July 14, 2004 Grievance, Ms. Meccariello summoned Ms. Martin to a meeting on July 15, 2004, with Tom Dempsey and Annetta Graham present.

During the July 15, 2004 meeting, Ms. Meccariello and Mr. Dempsey acknowledged that Ms. Graham had made an error regarding the employment starting date of a client and that Ms. Martin solved the problem by taking the client to his new job

Ms. Graham denied that she told Ms. Martin, "F--k you, Lowry," but claimed that she told Ms. Martin, "Bump you, Lowry."

Whether Ms. Graham actually said, "F--k you, Lowry" or "Bump you, Lowry," in response to Ms. Martin's concerns about Ms. Graham's actions that nearly cost a client a job, Ms. Graham's conduct amounts to misconduct under The Arc's discipline policy.

Ms. Graham acted unprofessionally and inappropriately when she lashed out at Ms. Martin personally rather than respond with a responsible, professional discussion of whether she appropriately performed important job duties that affected the employment of a person with mental retardation.

Pursuant to The Arc's Grievance Policy, The Arc was required to process

7

Ms. Martin's July 16, 2004 Grievance.

The Arc never processed Ms. Martin's Grievance.

Ms. Martin received no written response and no opportunity to progress to Step 2 or Step 3 in the grievance process, as discussed in the Arc's Discipline and Grievance Procedures in its Personnel Policies. (**Exhibit C**)

On or about July 15, 2004, Ms. Meccariello told Ms. Martin that it was "ridiculous" that Ms. Martin had submitted "a four-page memo" of "he said, she said."

Ms. Meccariello terminated Ms. Martin from The Arc on July 16, 2004, two days after she filed her Grievance.

During the July 15, 2004 meeting, Ms. Meccariello admonished Ms. Martin for including the "P.S." in her Grievance, which reads:

> I would like also to mention that quite a few of the clients identified by Ms. Graham and her staff in my opinion need to be re-evaluated in regard to employment. As I feel they are really not ready to take on employment even with the support of a job coach, I can inform you of who they are if you wish, however I will try to place them.

Ms. Martin told Ms. Meccariello, Tom Dempsey and Annetta Graham that some of The Arc's clients were sitting at ARC, day after day, not receiving job training.

It is true that some of The Arc's clients were sitting at ARC, day after day, not receiving job training and not being placed. Ms. Martin expressed her compassion for these clients and her belief that the clients would be better served spending the "waiting time" in a productive, rehabilitative environment, rather than sitting in the offices of ARC all day, day after day, without jobs.

Ms. Martin told Ms. Meccariello, Tom Dempsey and Annetta Graham that some Arc clients who await employment in Arc's waiting rooms have major impediments to employment including, but not limited to, the inability to control their excrement, the inability to follow instructions, the inability to control calling

out, and the inability to refrain from taking other people's property and keeping it.

1) It is true that some of Arc's clients awaiting employment in Arc's waiting rooms have major impediments to employment including, but not limited to, the inability to control their excrement, the inability to follow instructions, the inability to control calling out, and the inability to refrain from taking other people's property and keeping it.

Ms. Martin attempted to discuss with Ms. Meccariello, Tom Dempsey and Annetta Graham better methods of serving the clients of Arc and to best meet their needs, as well as to bring to the attention of Ms. Meccariello, Tom Dempsey and Annetta Graham that The Arc was not fulfilling its obligations to its clients or to the funding government entities by leaving clients without work to perform, training while awaiting employment, or qualified job coaches during employment.

During the meeting on July 16, 2005, during which Ms. Meccariello terminated Ms. Martin, Ms. Meccariello chastised Ms. Martin for responding to a case manager for a client, Mr. Washington, when he inquired about whether Ms. Martin would attend a meeting concerning his client.

Ms. Meccariello told Ms. Martin that she should *never* indicate to a person outside of ARC that a co-worker had made a mistake because it reflects badly upon ARC.

Ms. Martin explained to Ms. Meccariello that she only made the statement to Mr. Washington because Ms. Graham had already told him that she had left a message for Ms. Martin on her office voicemail about the meeting. Ms. Martin could not respond to Mr. Washington's questions about the planned meeting because she had never been informed of it. Ms. Martin truthfully explained that she did not neglect her duties, but that there was no message on either her office or cell phone regarding the meeting.

Ms. Graham's comments to Mr. Washington, indicating that Ms. Martin had

9

failed to respond to her message about the planned meeting regarding a client made Ms. Martin, then an ARC employee, appear to be negligent. Although Ms. Martin was terminated, Ms. Graham was not terminated for her statements to Mr. Washington indicating that Ms. Martin was informed of a meeting, but was neglecting her duties with respect to that meeting.

Ms. Meccariello terminated Ms. Martin on July 16, 2004 because she was afraid that Ms. Martin would be a "whistleblower" and report to the federal and/or D.C. government that The Arc is not utilizing government funds in the manner prescribed or anticipated in its contracts with the government.

Ms. Meccariello made no reasonable effort to comply with its contracts with the U.S. Department of Health and Human Resources and the District of Columbia Mental Retardation Developmental Disabilities Program or to better serve The Arc clients, persons with mental retardation, but continued the policy and practice of leaving clients without training while awaiting employment, nor did Ms. Meccariello provide the clients with qualified job coaches during employment.

Ms. Martin was not terminated for misconduct.

Ms. Martin did not commit any misconduct or any other act that constituted "cause" for termination.

The Arc has not alleged that Ms. Martin committed any misconduct or any other act that constituted "cause" for any form of discipline under The Arc's written discipline policy.

On Friday, July 16, 2004, Ms. Meccariello ordered Ms. Martin to clean out her desk within the following half hour.

When Ms. Martin told Ms. Meccariello that she needed more time than the time to sort out her belongings than half an hour, Ms. Meccariello told Ms. Martin that she would have to leave within half an hour, and could only return after 5:00 on Monday, rather than during regular business hours, to complete sorting out her

belongings.

On July 19, 2004, the Arc sent Ms. Martin a letter stating that she was terminated, as of the date the letter was written, July 19, 2004. No reason is stated, in the letter, for Ms. Martin's termination. (**Exhibit F)**

The District of Columbia Unemployment Office specifically found that The Arc did not terminate Ms. Martin for "cause" or other misconduct; accordingly, Ms. Martin received Unemployment Compensation Benefits after being terminated from The Arc.

The Arc reported no reason at all for Ms. Martin's termination, although the Maryland Office of Unemployment Insurance specifically requested that The Arc provide a reason for the termination. (**Exhibit G**)

The Arc's personnel records and separation documents normally include the reason for an employee's termination.

Ms. Martin's personnel records and separation documents do not include any reason for her separation from The Arc.

On or about July 16, 2004, Ms. Meccariello told Ms. Martin she was being discharged because she was her "own person" and was a "mover and a shaker." Ms. Meccariello told Ms. Martin that she admired these qualities, but that these qualities did not fit in at ARC.

At the same time that Ms. Meccariello terminated Ms. Martin, it retained, as an employee, Annetta Graham

At the time that The Arc terminated Ms. Martin, Annetta Graham was The Arc employee who had failed to adequately perform her duties to provide designated services to ARC clients, and whose duties had to be performed by Ms. Martin.

Ms. Meccariello did not terminate Ms. Graham for her misconduct toward Ms. Martin or for her neglect of duties with respect to Cartina.

At the time that Ms. Meccariello terminated Ms. Martin, Annetta Graham was the employee who had committed misconduct, in violation of The Arc's disciplinary policy, by acting in an unprofessional and disrespectful manner toward a co-worker, Ms. Martin, by saying to her, "F--k you, Lowry."

At the same time that Ms. Meccariello terminated Ms. Martin from its employ, it retained Annetta Graham, the employee who, indisputably committed misconduct, in violation of The Arc's disciplinary policy, by acting in an unprofessional and disrespectful manner toward a co-worker, Ms. Martin, by admittedly saying to her, "Bump you, Lowry."

While Ms. Martin was employed by the Arc, she placed Arc clients, persons with mental retardation, into jobs with employers that she had solicited.

Upon information and belief, as of May of 2005, ten months after the Arc terminated Ms. Martin, The Arc had not placed *any* persons with mental retardation into jobs under the job conversion contracts intended to train and place persons with mental retardation in appropriate employment, funded by Federal and D.C. governments.

Upon information and belief, as of May of 2005, in the nearly one year after the Arc terminated Ms. Martin, The Arc has not placed *any* persons with mental retardation into jobs under the job conversion contracts intended to train and place persons with mental retardation in appropriate employment, funded by Federal and D.C. governments.

Ms. Graham was eventually terminated for taking leave on false pretenses, i.e. claiming that her young son was having open heart surgery, when, in fact, her son was well and attending school.

Even after Ms. Graham was terminated, The Arc made no attempt to re-hire Ms. Martin, although its representatives knew that Ms. Martin was still unemployed, in need of employment and sought reinstatement with the Arc.

**II. False Claims Act and D.C. Whistleblower Protection Act ("Whistleblower" Claims)**

Plaintiff reiterates and re-alleges paragraphs 1-91.

The Arc's termination of Ms. Martin, based on Ms. Meccariello's fear that Ms. Martin would report to the federal and/or D.C. government that The Arc is not utilizing government funds in the manner prescribed or anticipated in its contracts with the government constitutes a misuse of government funds and resources, in violation of the federal False Claims Act, 31 U.S.C. §§ 3729-3733, and the D.C. Whistleblower Protection Act, DC Code §1-615.53.

**II. Breach of Contract: The Arc Breached its Own Progressive Discipline Policy**

Plaintiff reiterates and re-alleges paragraphs 1-93.

The Arc's written employment policies, § 10.1 -10.3, include a progressive discipline policy that requires oral and written warnings of possible future discipline for "simple misconduct," with an opportunity for improvement, prior to the imposition of more serious discipline, such as probationary status, suspension or discharge (§ 10.3).  (**Exhibit C**)

The Arc's written personnel policies were incorporated into Ms. Martin's employment contract with The Arc.

Ms. Martin was never subject to probationary status or suspension prior to her discharge.

Ms. Martin was never administered written reprimand before ARC imposed upon her the ultimate discipline of termination.

The Arc's termination of Ms. Martin violates its own progressive discipline policy, and thus, breaches her employment contract with ARC.

**III.    Intentional Infliction of Emotional Distress**

Plaintiff reiterates paragraphs numbered 1-99.  The events described therein described constitute extreme and outrageous behavior that shocks the conscience.

Where an employer supports an employee who commits misconduct and/or

an act against another employee, that conduct is imputed to the employer. An employer's retention of an employee who has committed a tort constitutes ratification of the tortuous conduct. *Prunty v. Arkansas Frieghtways,* 16 F.3d 649 (5th Cir. 1994).

By failing to remove or otherwise reprimand Annetta Graham for her intentional infliction of emotional distress upon Ms. Martin, The Arc tolerated, supported and/or ratified Ms. Graham's actions and should be held liable for her actions, based on *respondeat superior*.

## DAMAGES

Ms. Martin was damaged by her termination, financially and emotionally. Over the past ten months since her termination, Ms. Martin has been unable to pay her basic costs of living for herself of her children, two of whom are still under the age of eighteen. Ms. Martin has accumulated substantial debt, and has been experiencing severe emotional distress.

## REMEDY

Ms. Martin seeks the following relief:

1) back-pay, in the amount of $28,000 (losses to date);

2) reinstatement or one year of front pay, in the amount of $40,000;

3) compensatory damages ($100,000);

4) punitive damages ($100,000); and

5) attorneys' fees.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial.

Respectfully submitted,

Dawn V. Martin, Esquire
Federal Bar Number 412348
*Law Offices of Dawn V. Martin*

        1090 Vermont Avenue, Suite 800
        Washington, D.C. 20005
        (202) 408-7040 telephone
        (703) 642-0208 *facsimile*
        DVMARTINLAW@yahoo.com
        www.dvmartinlaw.com

Serve:

Michael Petkovich, Esquire
Jackson and Lewis
8614 Westwood Center Drive
Vienna, Virginia 22182

Counsel for Defendant