

## *Law Offices of Dawn V. Martin*

Specializing in Equal Employment Opportunity Law and Personal Injury Law

| | |
|---|---|
| 1090 Vermont Avenue | Telephone: (202) 408-7040 |
| Suite 800 | FAX:       (703) 642-0208 |
| Washington, D.C. 20005 | DVMARTINLAW@yahoo.com |

Website: http://www.firms.findlaw.com/dvmartinlaw

July 20, 2004

Ms. Mary Lou Meccariello
Director
The Arc of the District of Columbia
900 Varnum Street, N.E.
Washington, D.C. 20017-2950

**By mail and *facsimile* (202) 636-2996**

Re: **Litigation against ARC for Termination of Ms. Lowry Martin**

Dear Ms. Meccariello:

Ms. Lowry Martin has just retained my firm for the purpose of pursuing legal claims against the ARC of the District of Columbia. According to Ms. Martin, she was employed by the ARC until she was terminated on Friday, July 16 2004. Based on Ms. Martin's description of events, as well as my review of the ARC's written employment policies and other documents, I believe that Ms. Martin has several possible legal claims against the ARC: 1) breach of contract; 2) "whistleblower" protections, under both the federal False Claims Act, 31 USC 3729-3733, and the D.C. Whistleblower Protection Act, DC Code §1-615.53; and 3) intentional infliction of emotional distress.

## I. **The ARC Breached its Employment Contract with Ms. Martin**

### A. **The ARC Breached its Own Progressive Discipline Policy**

Where an employer has written personnel policies, those policies become part of the employment contract. The ARC's written employment policies § 10.1 -10.3, include a progressive discipline policy that requires oral and written warnings of possible future discipline for "simple misconduct," with an opportunity for improvement, prior to the imposition of more serious discipline, such as probationary status, suspension or discharge (§ 10.3). Ms. Martin was never subject to probationary status or suspension prior to her discharge, and, in fact, was never administered a verbal or written warning or

other discipline before ARC imposed upon her the ultimate discipline of termination, with no notice.

Ms. Martin tells me that you ordered her to clean out her desk within the following half hour and that when she told you that she needed more time than the time left in the business day before she needed to leave, to sort out her belongings, you told her that she could only return after 5:00 on Monday, rather than during regular business hours.

According to Ms. Martin, you did not accuse her of any misconduct, but rather, stated that she was being discharged because she was her "own person" and was a "mover and a shaker." Again, according to Ms. Martin, you told her that you admired these qualities, but that these qualities did not fit in at ARC. Ms. Martin told me that she was surprised by this conclusion since, when she was hired, less than a year ago, she was specifically told that ARC needed a "mover and a shaker" to implement the job conversion program intended to train and place persons with mental retardation in appropriate employment.

ARC's termination of Ms. Martin violates its own progressive discipline policy, and thus, breaches her employment contract with ARC.

### B. **The ARC Violated its own Grievance Procedure**

The ARC's personnel policies, § 9.1-9.2, include a Grievance procedure. Ms. Martin filed a Step 1 Grievance, pursuant to the written Grievance procedure, on July 14, 2004. In her four-page grievance, Ms. Martin detailed actions by Annetta Graham that clearly constitute both simple and gross misconduct under ARC's stated discipline policies, §§10.2.1 and 10.2.2. Ms. Martin's grievance included specific allegations that Ms. Graham committed conduct that constituted failure to perform her duties, in violation of § 10.2.1, defining "simple misconduct." More importantly, Ms. Martin alleged that Ms. Graham committed specific that constituted neglect of persons served by the ARC and abuse of persons, including verbal harassment, in violation of § 10.2.1, defining "gross misconduct."

### 1. **Ms. Martin Grieved the Fact that she had to Perform Duties Neglected by Another Employee**

Ms. Martin's Grievance explained that she had to perform the duties neglected by Ms. Graham, in order to prevent a client from losing a job. Among the misconduct detailed by Ms. Martin, Ms. Graham scheduled a meeting in her absence and did not inform her of the meeting, although Ms. Martin was a necessary party to the meeting, and that this conduct nearly cost the a client a job. When Ms. Martin attempted to talk to Annetta Graham about the duties she had neglected and the near consequences of this non-performance, Ms. Graham not only refused to respond, but dismissed Ms. Martin, with the utmost disrespect and vulgarity, saying, "Fuck you, Lowry." Ms. Martin reports that she replied, "Now, Annetta, how unprofessional is that?"

## 2. **Ms. Martin Grieved Verbal Harassment by Another Employee**

Ms. Graham has surpassed disrespect of Ms. Martin, with her vulgar, verbal abuse and her exclusion of Ms. Martin from meetings and other information that is necessary to properly serve ARC's needy clients – persons with mental retardation. Ms. Martin was harassed and thwarted in her ability to perform her duties, and yet, placed these "hard to place" persons in viable positions, and performed not only her own job, but job duties of Annetta Graham as well. For this, she was told "Fuck you, Lowry," and fired.

Ms. Martin informs me that Ms. Graham claims that she said, "Bump you, Lowry." In a trial, a jury would have to make a credibility determination regarding whether Ms. Graham said, "Fuck you, Lowry," as Ms. Martin adamantly states, or whether she said, "Bump you, Lowry," *as Ms. Graham admits*. I frankly suspect that jurors would be more inclined to believe Ms. Martin's quote of the more common phrase. Personally, I have never heard anyone ever say, "Bump you," but I have heard the more common phrase many times.

Under either Ms. Martin's or Ms. Graham's version of the facts, Ms. Graham's conduct amounts to an incredibly unprofessional, childish and disrespectful dismissal of valid job-related concerns. Annetta Graham lashed out at Ms. Martin personally rather than respond with a responsible, professional discussion of whether she appropriately performed important job duties that affected the employment of a person with mental retardation.

Ms. Martin's grievance was not processed at all. In fact, Ms. Martin reports that you told her that it was "ridiculous" that she submitted "a four-page memo" of "he said, she said." Ms. Martin received no written response and no opportunity to progress to Step 2 or Step 3 in the grievance process. Instead, she was fired two days after filing the Grievance. The ARC violated its own Grievance policy by not addressing Ms. Martin's concerns through its stated policy. In addition, Ms. Martin was terminated while Annetta Graham was retained, despite her alleged and even admitted misconduct and unprofessional behavior.

The day after Ms. Martin filed the Grievance, Ms. Martin tells me that you called her into your office, with Mr. Tom Dempsey, her direct supervisor. Ms. Martin tells me that, during the meeting, Mr. Dempsey conceded that Annetta Graham had made an error regarding the employment starting date of a client and that Ms. Martin solved the problem by taking the client to his new job; nevertheless, Ms. Martin reports that she was chastised for making an issue of reporting to you and Mr. Dempsey Ms. Graham's mistake and her response to her own mistake (not "Thank you, Lowry," but "Fuck you, Lowry.")

Ms. Martin also reports that she was chastised for telling a funding agent, "Mr. Washington," when he inquired about whether Ms. Martin would attend a meeting

3

concerning a client. Ms. Martin responded that she was not aware of the meeting. Ms. Martin reports that you told her that she should never indicate to a person outside of ARC that a co-worker had made a mistake because it reflects badly upon ARC; however, Ms. Martin reports that she only made the statement to Mr. Washington because Ms. Graham had already told him that she had left a message for on Ms. Martin's cell phone voicemail about the meeting. Clearly, if Ms. Graham told Mr. Washington that she left a message for Ms. Martin about the meeting and Ms. Martin could not respond to questions about the planned meeting because she had never been informed of it, Ms. Martin had a right to truthfully explain that she did not neglect her duties, but that there was no message on her cell phone regarding the meeting. *It was Ms. Graham left that co-worker appearing to be negligent in front if the funding agent by telling that funding agent she left her co-worker a message about a meeting when she had not done so.*

The ARC did not process Ms. Martin's Grievance, but fired her in response to it.

## II. "Whistleblower," or False Claims Act Claims

Ms. Martin reports to me that, during the July 15, 2004 meeting with you, Tom Dempsey and Annetta Graham, you were extremely upset about the "P.S." in Ms. Martin's Grievance, which reads:

> I would like also to mention that quite a few of the clients identified by Ms. Graham and her staff in my opinion need to be re-evaluated in regard to employment. As I feel they are really not ready to take on employment even with the support of a job coach, I can inform you of who they are if you wish, however I will try to place them.

Ms. Martin's stated intent was to better serve the clients of ARC and to best meet their needs. Ms. Martin reported to me that clients are sitting at ARC, day after day, not receiving job training and not being placed. Ms. Martin expressed her compassion for these clients and her belief that the clients would be better served spending the "waiting time" in a productive, rehabilitative environment, rather than sitting in the offices of ARC all day, day after day, without jobs. Ms. Martin related to me that, presently, some of ARC's clients awaiting employment in ARC's waiting rooms have major impediments to employment including, but not limited to, the inability to control their excrement, the inability to follow instructions, the inability to control calling out, and the inability to refrain from taking other people's property and keeping it.

The ARC's breach of its employment contract with Ms. Martin, and her termination while retaining the employee who committed the misconduct in question, may well be explained by a fear that Ms. Martin will report to the federal and or D.C. government that the ARC is not utilizing government funds in the manner prescribed or anticipated in its contracts with the government. The events reported by Ms. Martin may well constitute a misuse of funds and resources, in violation of the federal False Claims Act and the D.C. Whistleblower Protection Act.

Clearly, I would have to obtain the contracts, either through discovery in litigation, or through a FOIA request to the federal and D.C. governments, to determine more specifically if ARC's use of funds, granted to assist persons with mental retardation, comports with the specifications of the contracts; however, I believe that your reported reaction to the "P.S." in Ms. Martin's Grievance, and your intense admonition to her regarding reporting any ARC internal interactions to a "funding agent," implies that Ms. Martin was fired because you perceived that Ms. Martin might report to a "funding agents" or government authority, that ARC is not providing the services to persons with mental retardation promised by the contract.

### III. Intentional Infliction of Emotional Distress

The events as described above constitute extreme and outrageous behavior that shocks the conscience. See generally *Harris v. Jones*, 281 Md. at 566, quoting *Restatement of Torts*, Section 46. According to Ms. Martin, ARC management concedes that Ms. Graham made an error regarding a client's starting date and that Ms. Martin saved the client's job by performing the service needed for the client, although it was not within her normal job duties and created an extra burden on her; yet, the employee who neglected her duty, and then told Ms. Martin "Fuck you, Lowry," instead of thanking her, is retained, while Ms. Martin is terminated – in violation of the progressive discipline policy and the grievance procedure. Ms. Graham's verbal attack upon Ms. Martin was only one of a series of harassment by Ms. Graham that included various acts designed to sabotage Ms. Martin's ability to effectively perform her job and provide appropriate services to persons with mental retardation served by ARC.

Where an employer supports an employee who commits misconduct and/or an act against another employee, that conduct is imputed to the employer. An employer's retention of an employee who has committed a tort constitutes ratification of the tortuous conduct. *Prunty v. Arkansas Frieghtways,* 16 F.3d 649 (5th Cir. 1994). By failing to remove or otherwise reprimand Annetta Graham for her intentional infliction of emotional distress upon Ms. Martin, the ARC tolerated, supported and/or ratified Ms. Graham's actions and should be held liable for her actions, based on *respondeat superior*.

### IV. Remedy

In lieu of litigation, Ms. Martin would like to resolve this matter in the interests of all concerned. As a remedy for the potential claims described above, Ms. Martin seeks the following:

1) reinstatement or future pay

    a. reinstatement, under conditions that ensure that ARC management, Ms. Graham and/or others will not be permitted to harass her, retaliate against her for raising the claims discussed herein, or otherwise undermine her ability to perform her job; or

    b. compensate Ms. Martin in the amount of year's salary, $40,000, as "future pay" to allow her find comparable employment, and provide her with a reference that honestly reflects her work performance at

5

> ARC; and
>
> 2) develop a rehabilitative and/or recreational plan for the persons with mental retardation who are awaiting jobs and sit at ARC without activities day after day;
>
> 3) compensate Ms. Martin, in the amount of $40,000, for the emotional distress that she has suffered as a result of ARC's intentional breach of her employment contract, deprivation of her contractual rights and support of a co-worker's harassment of her, causing a hostile work environment;
>
> 4) pay Ms. Martin's attorneys' fees (currently $4,800, including 12 hours of work, at a rate of $400.00 per hour).[1]

You may write or call my office to discuss possible resolution of this matter. If I do not receive a response within seven (7) days, however, I will assume that you are not interested in resolving this matter without litigation and will begin drafting a complaint, to be filed in Federal District Court for the District of Columbia. Because we will allege a violation of the federal False Claims Act, it will be appropriate to file this action in federal court.

> Sincerely,
>
> Dawn V. Martin

---

[1] Attached is my resume, describing my twenty-three years of legal experience and expertise in employment law and experience with the False Claims Act, justifying the *Laffey* rate of $400.00 per hour. You may also visit my website at www.firms.findlaw.com/dvmartinlaw.