# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**Lowry Martin,**                                    )
        Plaintiff,                        )          Civil Action No. 05-01411
        v.                                       )           EGS
)
**The Arc of the District of Columbia**      )
        Defendant.                     )
_____)


## <u>PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTON TO DISMISS</u>

Plaintiff Lowry Martin respectfully opposes *Defendant's Motion to Dismiss* her claims under The False Claims Act ("FCA")or "Whistleblower" Act.  Ms. Martin has filed two separate False Claims Act actions.  The first claim was filed pursuant to 31 U.S.C. §§3729(a), 3730(b) 3730(d)(1)-(2), or a "*qui tam*" action by Ms. Martin, as a private persons, on behalf of the government, for reimbursement of monies paid to the Defendant, "the Arc," based on fraudulent representations to the government regarding the services it provides to its clients, persons with mental disabilities.  Ms. Martin's second FCA action is a wrongful termination, retaliation claim, brought under §3730(h), since she was fired based on her supervisor's fear that she would report the Arc's fraud to the government.

Ms. Martin's Complaint also includes two common law claims, for breach of contract and intentional infliction of emotional distress.  Defendant has moved to dismiss all three claims on their merits.  For the reasons stated below, Defendant's motion should be denied with respect to all three claims.

## I.  BACKGROUND

### A.  Facts Forming the Basis of the Claims

The Defendant Arc of the District of Columbia (hereinafter, the "Arc"), is a non-profit 501(c)(3) membership organization established to serve persons with mental retardation and related developmental disabilities and their families in the District of Columbia.  The Arc , D.C., was formerly known as the D.C. Association for Retarded Citizens.  (**Exhibit A**, pamphlet entitled "The Arc of D.C.").  Compl. ¶ 1.  The Arc receives funding from both the federal and District of Columbia governments for the purpose assisting persons with mental retardation obtain and maintain gainful employment.  Compl. ¶ 2.  The Arc's federal funding is administered through the Department of Health and Human Services, Medical Assistance Administration, under a Medicaid Waiver Contract, for the purpose of carrying out its mission of implementing a job conversion program intended to train and place persons with mental retardation in appropriate employment.  Compl. ¶ 2.

The Arc also receives funding from the government of the District of Columbia, MRDDA, Mental Retardation and Developmental Disabilities Administration, a the Human Care Contract, for the purpose of carrying out its mission of implementing a job conversion program intended to train and place persons with mental retardation in appropriate employment.   Compl. ¶ 4.

The Arc's funding contract with the United States Department of Health and Human Services, Medical Assistance Administration, under a Medicaid Waiver Contract, includes a provision that requires The Arc to hire job coaches who have at least one year of experience as job coaches and who are qualified to coach persons with mental retardation to perform the duties of jobs that are available to them.  Compl. ¶ 5.  Its funding contract with the District of

Columbia, MRDDA, Mental Retardation and Developmental Disabilities Administration, a the

Human Care Contract, includes a provision that requires The Arc to hire job coaches who have

at least one year of experience as job coaches and who are qualified to coach persons with

mental retardation to perform the duties of jobs that are available to them.  Compl. ¶6.

Ms. Mary Lou Meccariello is the Executive Director of The Arc.  Compl. ¶ 7.  Mr.

Thomas Dempsey is the Director of Business Operations of The Arc.  Compl. ¶ 8.  Ms.

Meccariello hired Plaintiff, Ms. Lowry Anita Martin, to assume the position of

Employment/Marketing Development Specialist, by letter dated October 7, 2003, on behalf of

The Arc of the District of Columbia.  Compl. ¶ 9; Compl. Exhibit B.  Ms. Martin was

employed by The Arc from October 27, 2003 to Friday, July 16, 2004, 2004, as the Arc's

Employment/Marketing Development Specialist.  *Id*.

The Arc hired Ms. Martin as an Employment Marketing Specialist, also known as the

"Coordinator, Job Development Activities for Conversion Model, to place persons with mental

retardation (hereinafter, "clients") in gainful employment.  Compl. ¶¶ 20, 21.  When Ms.

Martin was interviewed by Ms. Meccariello, Ms. Meccariello specifically stated that The Arc

needed a "mover and a shaker" to implement the job conversion program intended to train and

place persons with mental retardation in appropriate employment. Compl. ¶ 23.  Ms. Martin's

job description at The Arc are described in her Complaint, ¶ 25 and Compl. Exhibit D.

Ms. Martin performed all of the duties of her position, as described in paragraph # 30,

above.  Compl. ¶ 26.  She solicited employers to obtain positions for ARC clients, placed ARC

clients in gainful employment and assisted ARC clients with job coaching, transportation and

other serves to assist them in maintaining gainful employment.  Compl. ¶ 27.

Annetta Graham was also an employee ARC.  Compl. ¶ 29.  Ms. Martin had to perform

the duties neglected by Ms. Graham, in order to prevent The Arc's client, "Cartina,"[1] from losing the job that The Arc had just secured for her. Compl. ¶ 30. Ms. Graham made an error regarding the starting date of the position for a client, Cartina, and therefore failed to provide transportation for Cartina to her new job, as was necessary in order for Cartina to secure and perform the job. Compl. ¶ 31. Ms. Martin saved Cartina's job from termination by performing the required transportation to Cartina, using her own personal vehicle, although it was not within her normal job duties to provide for a client for regular work attendance. Compl. ¶ 32. See also **Exhibit 1** of this Opposition, Declaration of Donald Exner, Esquire, attorney and guardian for Cartina; **Exhibit 2**, affidavit of Crispin O'Conner, Supervisor of Case Managers at MRDDA, the D.C. funding agency for the Arc, who supervised Gary Washington, case manager for Curtina.

In addition to providing transportation for Cartina to and from work for several days, Ms. Martin also performed the duties of "job coach" for Cartina, awaiting The Arc's assignment of a qualified job coach to assist Cartina. Compl. ¶ 33. Ms. Martin attempted to discuss with Ms. Graham the to transportation and job coaching problems caused by the confusion with respect to Cartina's starting date for her new position. Compl. ¶ 34. Ms. Graham responded to Ms. Martin's inquiry by dismissing her with the words, "F--k you, Lowry." Compl. ¶ 35. Ms. Martin responded to Ms. Graham by stating, "Now, Annetta, how unprofessional is that?" Compl. ¶ 36. Ms. Graham had a practice of harassing Ms. Martin and thwarting Ms. Martin's ability to place clients in jobs and otherwise perform her job. Compl. ¶ 37.

Ms. Graham scheduled a meeting in Ms. Martin's absence and did not inform her of the

---

[1] The client's last name is omitted to protect the client's privacy in public records; however, the Arc only had one client named "Cartina" while Ms. Martin was employed by the Arc. The

meeting, although Ms. Martin was a necessary party to the meeting.  Ms. Martin alleged that

Ms. Graham's failure to tell Ms, Martin about the meeting nearly cost an ARC client a job.

Compl. ¶ 38.  On or about July 14, 2004, Ms. Martin filed a Grievance with The Arc

(Compl.Exhibit E)**,** pursuant to The Arc's Grievance Procedures.  Compl. ¶ 39.

Ms. Martin filed a Step 1 Grievance, pursuant to the written Grievance procedure, on

July 14, 2004.  In her four-page grievance, Ms. Martin alleged that Annetta Graham committed

misconduct.  Compl. Exhibit E**.** The actions alleged constituted both simple and gross

misconduct by Ms. Graham, under Arc's stated discipline policies, §§10.2.1 and 10.2.2.

Compl. ¶ 40; Compl. Exhibit C.  Ms. Martin reported that Ms. Graham committed specific acts

that constituted neglect of persons served by The Arc and abuse of persons, including verbal

harassment, in violation of § 10.2.1, defining "gross misconduct"  Compl. ¶ 42; Exhibit E.  The

Grievance stated that Ms.  Martin had to perform the duties neglected by Ms. Graham, in order

to prevent a client from losing a job.  Compl. ¶ 43; Compl. Exhibit E.   Ms. Martin further

reported that Ms. Graham scheduled a meeting in her absence and did not inform her of the

meeting, although Ms. Martin was a necessary party to the meeting, and that Ms. Graham's

failure to tell her about the meeting nearly cost Cartina her job.  Compl. ¶ 44.

The Arc's written Personnel Policies, § 9.1-9.2, include a Grievance procedure.

Compl. ¶ 11, Compl. Exhibit C.  Ms. Martin reported Ms. Graham's conduct, asking that

action be taken to avoid similar problems in the future.  Compl. ¶ 10, Compl. Exhibit E.  Ms.

Martin's grievance also noted her own observations regarding conditions for the Arc's clients

that indicated that the Arc was not providing its clients with the services required under its

government funding agreements.  Compl. ¶ 15, Compl. Exhibit E.

Ms. Martin included a "P.S." in her Grievance, which reads:

---

client's full name will be provided to the Court, under seal, as appropriate.

> I would like also to mention that quite a few of the clients identified by Ms. Graham and her staff in my opinion need to be re-evaluated in regard to employment.  As I feel they are really not ready to take on employment even with the support of a job coach, I can inform you of who they are if you wish, however I will try to place them.

Compl. ¶ 57.

Ms. Martin's Grievance also reported her own "close" working relationship with Mr. Washington, Cartina' case manager at MRDDA and her conversations with Mr. O'Conner, Mr. Washington's supervisor, when Mr. Washington was not available, as well as with Cartina's attorney and guardian, Donald Exner, Esquire.  Compl. Exhibit E. Ms. Martin explained how she had to coordinate with all of them to save Cartina's job, since the Arc. Had provided no job coach or transportation for Cartina and she was about to lose her job.  Compl. Exhibit E.  It was Ms. Graham's duty to supply both the job coach and the transportation, but the Arc had not hired the requisite number of job coaches, so there was a shortage, in violation of the Arc's funding contract.

In response to her July 14, 2004 Grievance, Ms. Meccariello summoned Ms. Martin to a meeting on July 15, 2004, with Tom Dempsey and Annetta Graham present.   Compl. ¶ 47. Ms. Meccariello and Mr. Dempsey acknowledged that Ms. Graham had made an error regarding the employment starting date of a client and that Ms. Martin solved the problem by taking the client to his new job.  Compl. ¶ 48.  Ms. Graham denied that she told Ms. Martin, "Fuck you, Lowry," but claimed that she told Ms. Martin, "Bump you, Lowry." Compl. ¶ 49. Ms. Meccariello told Ms. Martin that it was "ridiculous" that Ms. Martin had submitted "a four-page memo" of "he said, she said."  Compl. ¶ 55.

Whether Ms. Graham actually said, "Fuck you, Lowry" or "Bump you, Lowry," in response to Ms. Martin's concerns about Ms. Graham's actions that nearly cost a client a job,

Ms. Graham's conduct amounts to misconduct under The Arc's discipline policy. Compl. ¶ 50. Pursuant to The Arc's Grievance Policy, The Arc was required to process Ms. Martin's July 14, 2004 Grievance (Compl. ¶ 52); however, it never processed her Grievance. Compl. ¶ 53. Ms. Martin received no written response and no opportunity to progress to Step 2 or Step 3 in the grievance process, as required by the Arc's Discipline and Grievance Procedures in its Personnel Policies. (**Exhibit C**) Compl. ¶ 54.

Ms. Martin attempted to discuss with Ms. Meccariello, Tom Dempsey and Annetta Graham her belief that The Arc was not fulfilling its obligations to its clients or to the funding government entities by leaving clients without work to perform, training while awaiting employment, or qualified job coaches during employment. Compl. ¶ 62. Ms. Martin told Ms. Meccariello, Tom Dempsey and Annetta Graham that some Arc clients who await employment in Arc's waiting rooms have with major impediments to employment including, but not limited to, the inability to control their excrement, the inability to follow instructions, the inability to control calling out, and the inability to refrain from taking other people's property and keeping it. Compl. ¶ 60.

Ms. Martin told Ms. Meccariello, Tom Dempsey and Annetta Graham that most of The Arc's clients were sitting at ARC, day after day, not receiving job training and not being placed. Compl. ¶ 58. Ms. Martin expressed her compassion for these clients and her belief that the clients would be better served spending the "waiting time" in a productive, rehabilitative environment, rather than sitting in the offices of ARC all day, day after day, without jobs (Compl. ¶ 59), leaving clients without work to perform, training while awaiting employment or qualified job coaches during employment. Compl. ¶ 68.

On July 16, 2004, two days after Ms. Martin filed her grievance, she was again called

to a meeting with both of her direct supervisors, Mary Lou Meccariello and Thomas Dempsey. Ms. Meccariello angrily chastised Ms. Martin for comments in the "P.S." of her Grievance regarding the Arc's provision of services, or lack thereof, for its clients, which the Arc was obligated to provide, pursuant to its federal and District of Columbia funding contracts. Compl. ¶ 14.   Ms. Meccariello specifically admonished her for raising the issue that The Arc was not providing proper employment evaluations of clients, job training or job coaching. Compl. ¶ 15.

Ms. Meccariello further angrily chastised Ms. Martin for purportedly discussing another Arc employee's neglect of her duties with Mr. Washington and Mr. O'Connor, of its funding agency, MRDDA.  Compl. ¶ 16.  Ms. Martin explained to Ms. Meccariello that Ms. Graham had told Mr. Washington that she had left a message on Ms. Martin's cell phone voicemail about the meeting.  Ms. Martin truthfully explained that she did not neglect her duties, but that there was no message on her cell phone regarding the meeting.  Compl. ¶ 65. Ms. Martin could not respond to Mr. Washington's questions about the planned meeting because she had never been informed of it.

Ms. Meccariello told Ms. Martin that she should *never* indicate to a person outside of ARC that a co-worker had made a mistake because it reflects badly upon ARC.  Compl. ¶ 64. She ordered Ms. Martin never to speak to a funding agent about the operations of the Arc (Compl. ¶ 17) and accused Ms. Martin of not being a "team player."  Compl. ¶ 18.  Ms. Meccariello then fired Ms. Martin, during the meeting, with no warning or prior notice. Compl. ¶ 12, 56.  Ms. Meccariello told Ms. Martin she was being discharged because she was her "own person" and was a "mover and a shaker."  Ms. Meccariello told Ms. Martin that she admired these qualities, but that these qualities did not fit in at ARC.  Compl. ¶ 79.

Ms. Meccariello ordered Ms. Martin to clean out her desk within the following half hour. Compl. ¶ 72. When Ms. Martin told Ms. Meccariello that she needed more time than the time to sort out her belongings than half an hour, Ms. Meccariello told Ms. Martin that she would have to leave within half an hour, and could only return after 5:00 on Monday, rather than during regular business hours, to complete sorting out her belongings. Compl. ¶ 73.

On July 19, 2004, the Arc sent Ms. Martin a letter stating that she was terminated, as of the date the letter was written, July 19, 2004. No reason is stated, in the letter, for Ms. Martin's termination. Compl. ¶ 74; Compl. Exhibit F. The District of Columbia Unemployment Office specifically found that The Arc did not terminate Ms. Martin for "cause" or other misconduct; accordingly, Ms. Martin received Unemployment Compensation Benefits after being terminated from The Arc. Compl. ¶¶ 75, 76, Compl. Exhibit G.

Ms. Martin was not terminated for misconduct. Compl. ¶ 69. Ms. Martin did not commit any misconduct or any other act that constituted "cause" for termination. Compl. ¶ 70. The Arc has not alleged that Ms. Martin committed any misconduct or any other act that constituted "cause" for any form of discipline under The Arc's written discipline policy. Compl. ¶ 71. The Arc's personnel records and separation documents normally include the reason for an employee's termination. Compl. ¶ 77. Ms. Martin's personnel records and separation documents do not include any reason for her separation from The Arc. Compl. ¶ 78.

While Ms. Martin was employed by The Arc, she placed ARC clients, persons with mental retardation, into jobs with employers that she had solicited. Compl. ¶ 85. Upon information and belief, after Ms. Martin was terminated from The Arc, there were ARC clients, persons with mental retardation, persons placed in jobs by The Arc for at least a year. Compl. ¶ 86.

Guardians for clients of the Arc praised Ms. Martin for her compassion and success in placing the Arc's clients in gainful and fulfilling employment, having previously been disappointed with the Arc's inaction. **Exhibits 3, 4, 5 and 6**, affidavits of guardians of clients who were placed by Ms. Martin**.** Ms. Martin was respected by her co-workers, regarded as a person who shared information and assisted other co-workers in helping the Arc's clients. **Exhibits 7 and 8,** affidavit of Arc co-workers**,** Arlene Johnson and Amy Cau**.** The praise that she received from clients and co-workers while she worked at the Arc was consistent with the assessment of her work prior to joining the Arc. **Exhibits 9** (Ms. Martin's resume, collective references and work descriptions prior to joining the Arc**) and 10** Ms. Martin's awards and certificates of training in areas of job counseling and counseling persons with mental disabilities. After her termination from the Arc, Ms. Martin was thwarted in her ability to obtain similar employment, despite her excellent references from previous employment. **Exhibit 11**, collective references obtained after Ms. Martin's termination from the Arc.

Ms. Graham was eventually terminated for taking leave on false pretenses, i.e. claiming that her young son was having open heart surgery, when, in fact, her son was well and attending school. Compl. ¶ 87. Even after Ms. Graham was terminated, The Arc made no attempt to re-hire Ms. Martin, although its representatives knew that Ms. Martin was still unemployed, in need of employment and sought reinstatement with the Arc. Compl. ¶ 88.

Ms. Martin was damaged by her termination, financially and emotionally and with respect to her professional reputation. After her termination, Ms. Martin has been unable to pay her basic costs of living for herself of her children, two of whom were still teenagers, with the oldest preparing to attend college. Ms. Martin has accumulated substantial debt, and has been experiencing severe emotional distress. Compl. ¶ 100.

B. **Procedural Background**

Ms. Martin filed this case on July 15, 2005.  The False Claim Act required that she file her Complaint with this Court, under seal, and to serve a copy on the United States government.  31 U.S.C. §3730(b)(2), *Hoyte v. American Red Cross,* 439 F. Supp.2d 38, 40 (D.D.C. 2006).  The statute requires that the plaintiff keep the complaint under seal for at least 60 days to allow the government to determine whether it will replace the plaintiff in the lawsuit or intervene.  *Id*.  The government can requests extensions of the time and can very well take more than a year to decide whether it will participate in the lawsuit.  *Id*.  Although the plaintiff can move the court to unseal the record at any point after sixty days, it is not required to do so. It is normally in the best interests of the plaintiff to allow the government sufficient time to investigate and determine whether it will intervene, both due to the cost of litigation and the authority, resources and credibility brought to a case when the government elects to participate. In this case, it appears that the government had not completed its investigation and/or had elected not to participate, although no written notice was ever served on the Plaintiff or her counsel by either the federal or D.C. government, to that effect.

Due to the extensive passage of time since her July 15, 2005 filing of her Complaint, the Court dismissed the case, on April 6, 2006, the court dismissed this case, for failure to prosecute.  On April 21, 2006, Ms. Martin moved the Court to reopen the case and unseal the record, pointing out that she had not failed to pursue her claims, but was required to file under seal and could take no action until the case was unsealed.  Ms. Martin elected to move this case forward, even if without notice from the government regarding its position.  Although the Court ordered the record unsealed on June 13, 2006, the Clerk of the Court failed to unsealed it, so no electronic notices were sent to either party.  In addition, the Order was not mailed to

the parties since the Court assumed that it had been served electronically, as would have occurred had the record been unsealed, as ordered.

Ms. Martin filed a motion for a status conference to address her motion to unseal the record. In the course of re-scheduling the conference, the Court learned that its June 13, 2006 Order to unseal the record had never been implemented by the Clerk or distributed to the parties. On December 20, 2006, the Court again ordered the record unsealed and ensured that it was done. Both parties and both the federal and D.C. governments were notified that the record was unsealed.

Once the case was unsealed, Ms. Martin timely served the summons and Complaint on Defendant's counsel, Michael Petkovich, Esquire. Mr. Petkovich had previously responded to Ms. Martin's demand letters, through her counsel, Dawn Martin, Esquire and advised Dawn Martin[2] to communicate with his client, the Arc, only through him. Despite this instruction, Defendant challenged service, claiming that he was not authorized to accept service on behalf of his client. Defendant also argued that service was untimely because it was not served within 120 days of service of filing, despite Ms. Dawn Martin's specific explanation to Mr. Petkovich that, by statutory law, she was not permitted to serve the summons upon the Arc until the Court unsealed the record, and that, therefore, the time did not begin to run until the record was unsealed, on December 24, 2006.[3]

---

[2] Because both Plaintiff and her counsel are "Ms. Martin," all references to her counsel will specify "Ms. Dawn Martin" rather than Ms. Martin, unless otherwise clarified.

[3] Ms. Martin asked for sanctions for Defendant's frivolous motion and inconsistent arguments. In its *Motion*, Defendant argued that Ms. Martin never should have filed the case under seal and should have served it within 120 days of its July 15, 2005 filing. Contradicting itself, in its *Reply*, Defendant argued that Ms. Martin was obligated to file the Complaint under seal, but was also obligated to move the Court to unseal the record within 60 days of the filing. Both arguments were frivolous, based on the plain language of the FCA. Plaintiff reminds the Court of this history because its *Motion to Dismiss* is similarly disingenuous with respect to its representations of law. If the Defendant is permitted to continue these abusive tactics without penalty, the Court, plaintiff and her counsel will continue to be unduly burdened with otherwise unnecessary legal

On April 5, 2007, the Court granted Defendant's *Motion to Quash the Subpoena*, but denied the Arc's *Motion to Dismiss* the Complaint. The Court required the Plaintiff to re-serve the Complaint on the Arc by June 5, 2007; therefore, on May 24, 2007, Ms. Martin re-served the Arc by personal service on its Director, Mary Ann Meccariello; however, even while claiming that he was not the authorized agent of the Arc for purposes of service in this lawsuit, Mr. Petkovich never withdrew his appearance. Instead, he remained counsel of record at all times signed the *Motion to Dismiss* that Ms. Martin now Opposes.

## ARGUMENT

## II. The Standard of Review for Assessing a Motion to Dismiss

A court should not dismiss a complaint for failure to state a claim unless the defendant can show beyond doubt that the plaintiff can prove no set of facts in support of her claim that would entitle her to relief. *Warren v. District of Columbia,* 353 F.3d 36, 37 (D.C. Cir. 2004). The court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party," 2005 WL 485971 (D.D.C. 2005), citing *Warth v. Seldin,* 422 U.S. 490, 501 (1975); *Gilvin v. Fire,* 259 F.3d 749, 756 (2001). The consideration is limited to the allegations in the complaint and all factual doubts and inferences are to be resolved in favor of the plaintiff. *Williams v. Martin-Baker*, 398 F.3d 1251, 1261 (D.C. Cir. 2004).

## III. Rule 9(b) Does not Require Dismissal where Specificity in Pleading Cannot be Achieved without Discovery

### A. Rule 9(b) Must be Harmonized with Rule 8(a)

The sufficiency of a Complaint, pursuant to Fed. Civ. R. P. 8(a) provides that "a pleading "shall contain … a short and plain statement of the claim showing that the

---

work and financial expenditures to correct the Defendant's misrepresentations.

pleader is entitled to relief.     Fed. R. Civ. P. 9(b) requires that "the circumstances constituting fraud or mistake … be stated with particularity."  The D.C. Circuit has held that these two rules must be harmonized in a False Claims Act case.  *El-Amin v. George Washington University,* 2005 WL 485971 at * 4 (D.D.C. 2005).  Rule 9(b) must be construed in the context of the policies behind it.  *Id.*  Rule 9(b) was promulgated "to ensure that defendants have adequate notice of the charges against them to prepare a defense."  *Id.* "Ultimately, the key is to ensure that a 9(b) attach on a complaint is permitted only when absolutely necessary to effectuate the purposes and safeguard the integrity of the particularity requirement." Id.

At the pleading, or motion to dismiss stage, plaintiffs, without the benefit of discovery, may not have access to the specific documents or information that proves fraud on behalf of an organization.  *Yesudian*, 153 F.3d at 740; *Williams v. Martin-Baker*, 398 F.3d at 1258, citing *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1279, n. 3 (D.C. Cir. 1994) and *Harris v. Bernad*, 275 F. Supp.2d 1, 8-9 (D.D.C. 2003).  Pleadings "on information and belief" are therefore permitted, to relax the pleading in FCA cases, where "the necessary information lies within defendants' control."  *Kowal,* 16 F.3d at 1277, *citing In re Craftmatic Sec. Litig.,* 890 F.2d at 646 (3rd Cir. 1989).

**B.  Discovery is Necessary to Provide Additional Specificity for her *Qui Tam* Claim**

As discussed in *El-Amin v. George Washington University,* 2005 WL 485971 at * 5, "a number of New York officials who were part of an alleged conspiracy," citing *United States ex rel. Long,* 999 F.Supp. 78, 89-90 (D.D.C. 1998).   A claimant cannot reasonably be expected to name of all of the actors, relevant documents or their contents where "the information is entirely within the defendant's control."  *El-Amin*, 2005 WL

14

485971 at * 6.  The Arc is in complete control of all the necessary information to determine when and how its submissions and reports to the government were fraudulent.

Ms. Martin has sufficiently pled to put the defendants on notice of the claims against it.  She has identified Mary Lou Meccariello as one of the persons who conceal from the United States government the fraudulent representations made by others to the government that the Arc was providing those services.  She cannot know who else is involved fraudulent representation in reports to the government without the benefit of discovery.

Courts "almost always" permit plaintiffs to amend their pleadings, in the interests of justice and fairness, particularly early in litigation.  *El-Amin*, 2005 WL 485971 at *12, 13 *citing, inter alia, Firestone v. Firestone,* 76 F.3d 1205, 1209 (D.C. Cir. 1996) and Fed. Civ. R. 15(a).  Dismissal can be avoided, even where the Complaint lacks sufficient specificity, if the *Opposition to the Motion to Dismiss* includes the requisite specificity, *El-Amin*, 2005 WL 485971 at *13, *citing Shekoyan v. Sibley Int'l.,* 217 F. Supp.2d 59 (D.D.C. 2002).

If this claim is dismissed prior to discovery, however, Ms. Martin will never have the opportunity to prove that the Arc fraudulently received funds under the pretense of helping persons with mental disabilities train for and obtain employment.  A dismissal would not only result in a loss for Ms. Martin, but also for the public, the taxpayers and most of all, for persons with mental disabilities.

**IV. <u>The Arc Breached its Contract with Ms. Martin, Pursuant to its own Personnel
Policies Manual</u>**

    A.  <u>Defendant has Omitted Controlling Case Law Holding that an Employer's
Personnel Handbook may Constitute a Contract with its Employees</u>

On pages 5-6 of its *Motion to Dismiss*, Defendant argues that it had no obligation to
follow its own progressive discipline policy, as set forth in its own extensive Personnel Policies
Manual; therefore, it argues that Ms. Martin has no remedy at law for its blatant violation of its
own Manual.  In support of this argument, Defendant relies on only one case: *Taylor v.
Washington Metro Area Transit*, 922 F. Supp. 665 (D.D.C. 1999), an eight year old District
Court decision.  As discussed below, Defendant's representation of *Taylor i*s much less than
forthright – as is Defendant's omission of any citation to controlling decisions of the U.S.
Court of Appeals for the D.C. Circuit or the body of District Court decisions that have been
decided within the eight years since *Taylor* was decided.

In its *Motion to Dismiss,* Defendant has conspicuously omitted the controlling case law
in the D.C. Circuit interpreting proper complaints filed under the False Claims Act.  Despite a
wealth of controlling case law from the D.C. Circuit and this District Court, Defendant has
failed to cite *any* precedent on the FCA in this jurisdiction.  Instead, Defendant cites numerous
cases from the Fourth Circuit, one case from the Eleventh Circuit and one case from the Third
Circuit.  The Circuits do not interpret the False Claim Act consistently.  The Fourth Circuit, in
particular, has adopted a restrictive reading of the False Claims Act.  The D.C. Circuit, and
most other circuits, have adopted a more liberal and practical reading of the statute.

In *Yesudian v. Howard Univ.*, 153 F.3d at 745-748, the Court of Appeals held that the
Howard University Handbook, including detailed grievance and termination procedures,
converted the employment relationship from an "employment at will" status to a contract

requiring the employer, Howard University, to follow its own stated disciplinary, termination

and grievance procedures.    *Yesudian* specifically rejected Howard's argument that its

disclaimer, maintained the "at will" employment relationship. 153 F.3d at 745 at 745.   The

Handbook's statement, that management reserved the right to "discipline or discharge

employees for any other cause," was "insufficient" to rebut the contradictory language of the

Handbook that led employees to believe that they could only be discharged for "cause" and

then, only in accordance with certain procedures.  *Id*.  The Court of Appeals found that:

> the jury was justified in finding that the plaintiff reasonably relied on the
> provisions of the employee handbook to his detriment in that he followed the
> handbook grievance procedures at the expense of much time and money.

*Id*.

The D.C. Court of Appeals repeatedly held that a personnel manual can modify

the employment at will doctrine, even where the Manual also contains a disclaimer that

the policies do not modify the employment at will doctrine, under certain circumstances,

i.e., where the Manual provides for certain preconditions for termination, such as a

progressive discipline policy or certain grounds for termination, whether the employee

"could reasonably expect that the application of this policy was required before

termination."   744 A.2d at 1011-1014.

In 2000, the District of Columbia Court of Appeals held that:

> The terms of an employer's personnel or policy manual may be sufficient to
> raise a jury question as to whether the manual creates contractual rights for the
> employee.

*Strass v. Kaiser Foundation Health Plan*, 744 A.2d 1000, 1011 (D.C. 2000), *citing Nickens*

*v. Labor Agency of Metro Washington,* 600 A.2d 813, 817 (D.C. 1991); *Washington*

*Welfare Ass'n*, Inc. v. *Wheeler,* 496 A.2d 613, 615 (D.C. 1985).   The Court of Appeals

further held that:

> This court has held that a personnel manual that states specific preconditions
> that must be met before the employment will be terminated is sufficiently
> clear to rebut the presumption of at-will employment.

*Strass*, 744 A.2d at 1013, *citing Rinck v. Association of Reserve Bankers,* 676 A.2d 12, 16

(D.C. 1996) and *Wheeler*, 496 A.2d at 616.   The court proceeded to hold that the progressive

discipline policies in the employer's Manual that "established preconditions to termination"

could rebut the presumption of the "at-will" employment doctrine and create contract rights for

the employees.   *Strass*, 744 A.2d at 1014, citing *Sisco,* 689 A.2d at 57.   As in the present case,

the Personnel Manual in *Strass* specifically stated that the Manual did not constitute a contract

with employees; however, the court held that this statement was not determinative because it

was "at odds" with other language in the document, specifically, but not limited to, the

progressive discipline policy.   744 A.2d at 1013.[4]   The Court of Appeals reiterated its *Strass*

analysis in *Dantley v. Howard University*, 801 A.2d 962, 965 (D.C. 2002).   Despite language in

the Handbook stating that the Handbook does not create a contract with the employee, this

conclusory statement was not dispositive of the issue.   801 A.2d at 965.   The Handbook did not

contain the required language stating that the employer has the right to terminate "at will" and

the disclaimer conflicted with the termination policy set forth in the same Manual.

---

[4] The Court of Appeals for the District of Columbia reiterated its holding in *Strass* in *Futrell v. Department of Labor Federal Credit Union,* 816 A.2d 793, 807 (D.C. 2003), although, applying the facts, it arrived at a different disposition than it did in *Strass*.  816 A.2d at 808.  In *Futrell*, the plaintiff was not within the class of non-managerial employees that the Handbook addressed.  In addition, the Handbook did not include any specific preconditions that had to be met prior to termination.  Finally, Ms. Futrell admitted, in her deposition, that *she understood that the Employee Handbook did not create an express or implied contract*.  In light of these facts, there was no basis for a jury to determine that Ms. Futrell *believed* that she was working under an employment contract that guaranteed her certain procedural and substantive safeguards against termination at will.

The federal courts have appropriately applied the case law of the District of Columbia to this issue. The U.S. Court of Appeals for the D.C. Circuit has acknowledged that *Strass*, *Sisco, Nickens* and *Rinck* set forth the appropriate criteria and analysis for determining the circumstances under which an employer's personnel manual will suffice to overcome the presumption of an "at will" employment relationship. *Byrne v. National Railroad Passenger Corporation*, 184 Fed.Appx 6 (D.C. Cir. 2006).

This Court applied *Strass* in *Austin v. Howard University*, 267 F. Supp.2d 22, 25-28 (D.D.C. 2003), to hold that the inclusion of a contractual disclaimer "does not inevitably led to the conclusion that an employer is relieved of any obligation to comply with the manual's terms." 267 F. Supp.2d at 1011-1012. Quoting *Strass*, *Austin* held:

> All told, we think … that assurance by an employer in a personnel or policy manual distributed to all employees that are clear enough in limiting the right to terminate to specific causes or events will overcome the presumption of at-will employment. Such a promise … creates a triable issue of fact as to the existence of an implied contract for continued employment. In effect, promises meeting this test reverse the normal presumption…

The Court continued:

> The Handbook states that it is "not to be construed as a contract." … The inclusion of provisions which establish preconditions to the termination of a regular employee, however, suggests the opposite.

267 F. Supp.2d at 28. The Court then observed that the defendant "apparently took no steps to satisfy the Handbook's preconditions for termination." *Id.*

An employee who reads a personnel handbook, including specific procedures and conduct with which the employee must conform, as well as specific conditions and procedures for discipline and termination, would reasonably believe that the employer would follow its own written policy. Holding otherwise either renders an Employee Handbook meaningless or creates a unilateral contract, enforceable against the employee,

but not against the employer.  The employer should not be permitted to mislead

employees into believing that they have procedural safeguards and will be warned of

perceived misconduct or deficiencies, if the employer is, in fact, under absolutely no

obligation to adhere to its own written representations to its employees.  Certainly, a

reasonable juror to conclude that the parties intended each to be bound by the terms of its

own Personnel Handbook, creating a valid contract.

       In *Youngblood v. Vistronix, Inc.*, 2006 WL 2092636 (D.D.C. 2006), this Court applied

the *Strass* criteria to an employment relationship and assessed whether the Employee

Handbook's "disclaimer," asserting that an employee could be terminated with or without

cause" was "at odds" with its written disciplinary portion of its employee Handbook.  The

court determined that there was no conflict because the Handbook used the permissive

language "may," as contrasted with the word "shall," which was used in the employer's

Manual in *Strauss*.[5]  The Court held:

> In *Strass*, the D.C. Court of Appeals found a rational opposition between the
> presence of a disclaimer and the use of the word "shall."  *Strass,* 744 A.2d at
> 1013.  If a party "shall" do something, it makes little sense for the party
> elsewhere to say that it might not do it.  If a party "may" do something,
> however, it also may not do it.  Vistronix may disclaim an implied contract as
> to disciplinary measures on the grounds that the language describing those
> measures does not actually require that they be employed.

2006 WL 2092636 at *3.[6]

---

[5] *See also Boulton v. Institute of International Education*, 808 A.2d 499 (D.D.C. 2002)
(Handbook stating that "every effort" would be made to ensure job security and to locate another
suitable position for an employee whose job is eliminated, in conjunction with language stating
that the company could end an individual's employment "at its discretion," did not contradict the
"at will employment doctrine.")

[6] Accord, *Powell v. American Red Cross*, 2007 WL 1723656 at *15 (D.D.C. 2007) (Human
Resources Policy and Procedure Manual's use of the word "may" constitutes permissive language
and does not create contract right to severance pay).

In contrast to the disciplinary policy in *Vistronix*, the Arc's policy, like the policy in *Strass*, uses the mandatory language "will" and "is" rather than permissive language such as "may." As in *Strass*, it makes no sense" for the employer to state, in its Personnel Manual that it "will" do something and elsewhere, to state that it "might not do it." The Arc, like the employer in *Strass*, should be held to the terms of its own Personnel Manual after leading its employees to believe that it would follow that Manual.

### B. *Taylor* is Distinguished from *Martin*

Even in *Taylor*, this court acknowledged that the presumption of an "at will" employment relationship can be rebutted by evidence that the parties intended the employment to be "subject to specific preconditions before termination." 922 F.Supp. at 674. The court's dismissal of Mr. Taylor's claims turned on the facts – which are markedly distinguished from the case at bar. In *Taylor*, copies of the Personnel Manual were not routinely distributed to all employees; the plaintiff only had one because he was a supervisor. 922 F. Supp. at 674. Employees therefore could not claim that they even knew what about any termination policy in the Manual, let alone claim that they accepted the terms as part of their employment contracts.

As distinguished from *Taylor*, the Arc's Manual, Section 1.2, entitled "**Authority and Distribution of Manual,**" specifically required that *all* employees be provided a copy of the Manual, within 7 days of commencement of their employment, and that the terms of the Manual be explained to all new employees "when they attend the Orientation Program." Def.'s Ex. 1, page 9. In fact, Ms. Martin attended the Arc's Orientation Program on her second day on the job.

The Arc contends that because Ms. Martin gave no consideration for the Handbook's promises, no binding obligation was created; however, where an employee remains with an employer "after receipt of a personnel manual promising job security supplies the necessary consideration to make the promise legally enforceable." *Yesudian v. Howard Univ*., 153 F.3d 731, 748 (D.C. Cir. 1998), *quoting Sisco v. GSA Nat'l Capital Fed. Credit Union,* 689 A.2d 52, 56 (D.C. 1997). Because Ms. Martin remained with the Arc after receiving the Handbook, she satisfied the *Yesudian*/*Sisco* requirement.

The detailed, single-spaced, 36 page Personnel Manual clearly set forth a detailed, *mandatory* procedure that supervisors were obligated to follow before terminating or otherwise disciplining an employee, and under what conditions such discipline could be administered. Employees knew that they were expected to conform to the requirements of the detailed, conversely, they had a reasonable expectation that the Arc would follow its own Manual, particularly with respect to material employment conditions such as termination, discipline and grievances.

Finally, and quite significantly, the defendant in *Taylor* actually *did* comply with its own procedures set forth in its Manual. The *Taylor* court made this specific factual finding to justify its decision "even if the Manual could be found to constitute an employment contract…"[7] 922 F. Supp. at 674. In the present case, Ms. Martin has alleged, and will prove if permitted to present her evidence, that the Arc blatantly and flagrantly violated its own Manual, including its progressive discipline policy, its grievance procedures and termination policy, without "cause."

---

[7] Arguably, the Taylor Court's conclusion that there was no contract was simply *dicta*, rather than a necessary finding to reach its holding.

C.  **The Arc Violated its own Written Policy by Firing Ms. Martin, Particularly its Progressive Discipline, Termination and Grievance Provisions**

1.  **The Arc's Progressive Discipline/Termination Policy**

The Arc set forth a detailed progressive discipline policy in its Personnel Manual, § 10.1-10.3.  Def's Exhibit 1, pages 12-18.  The Manual sets forth the specific conduct for which an employee will be disciplined, including "Simple Misconduct" and "Gross Misconduct."  Manual, § §10.2.1 and 10.2.2.  The Manual, § 10.2 states:

> The degree of disciplinary action taken **is** dependent on whether the misconduct is considered "simple", as a series of minor rules or policy violations or "gross", a serious rule or policy violation.  (Emphasis added)

The Manual then proceeds to set forth a progressive disciplinary policy for misconduct that does not constitute "gross misconduct," which may result in immediate termination.  Sections 10.3.1-10.3.5 lists the stages of the progressive disciplinary policy.  The first is a "verbal warning," which states that the immediate supervisor "will" review concerns with the employee and "will" keep a record of the verbal warning.  Section 10.3.1.  Next, is a "written warning," which states that the supervisor "will" put the concerns in writing.

Section 10.3.2, entitled "Return to Probationary Status" and Section 10.3.4, "Suspension without Pay" provides the supervisor with the discretion to take either of these actions, as exhibited by the permissive use of the word "may."  The contrast between these provisions and the other steps in the progressive discipline policy clearly demonstrates that the Arc knew the difference between permissive and mandatory language and deliberately used the mandatory language in the other sections.

The Manual returns to the mandatory "will" language under § 10.3.5, entitled "Discharges:"

If an employee is discharged due to reasons of gross misconduct or as the final step in the progressive disciplinary process, he/she **will** be notified in writing.  All discharges must be approved by the Executive Director.  Reasons for the discharge **will** be documented and made part of the employee's personnel file. (Emphasis added)

Ms. Martin was not discharged for cause, or pursuant to the progressive discipline policy, nor was she notified in writing of her discharge, or even provided with any written reason for her termination.  Instead, she was fired, verbally, by the Executive Director, in a meeting in which she was called, purportedly, to discuss her grievance against another employee.

## 2.  **The Arc's Grievance Policy**

The Arc violated its own Grievance Policy, specifically set forth, in increment steps, in § 9 of its Manual.  Def's Exhibit 1, pages 10-11.  The language in the Grievance Procedure is even more emphatically mandatory than is the language in the progressive discipline Section.  Section 9 uses "must" repeatedly to state what both the employee and the supervisor must do with respect to filing, investigating and responding to grievances at each step of the process; yet, without explanation, the Arc failed and refused to process Ms. Martin's grievance, although she followed the mandatory procedure set forth in the Manual, § 9.  Instead, the Director, Mary Lou Meccariello, verbally chastised her for writing it, and, inexplicably, immediately imposed the ultimate penalty of termination on her for filing it.  Although taking a different form, Ms. Martin, like the plaintiff in *Yesudian*, lost substantial time and money as a result of their employers' breach of contract with respect to the grievance process.  Ms. Martin actually lost her job and her income, immediately, with children at home to support and her former job, from which the Arc recruited her, now filled and unavailable.

Ms. Martin is entitled to proceed to trial to allow a jury to decide whether the Arc breached its contract with her when it ignored its own progressive discipline and grievance policies and terminated her without cause.

## V.  Ms. Martin's Allegations Constitute Valid Claims under the "Whistleblower," or False Claims Act (FCA)

### A.  *Qui Tam* and Retaliation Cases under the FCA are Different Claims, with Different Elements

It is important to distinguish between the types of claims that can be brought under the FCA, in order to understand the elements of each claim and whether the plaintiff has satisfied the requirements of each claim.  The first type of FCA claim, pursuant to 31 U.S.C. §§3729(a), 3730(b) 3730(d)(1)-(2), or a "*qui tam*" action, is brought either by the government, or by private persons, on behalf of the government, for reimbursement of monies paid to persons or organizations who obtained of kept the money based on false pretenses.[8]

The second type of action is a retaliation claim, under §3730(h), based on conduct that is protected under other sections of the Act.  See *Hoyte v. American Red* Cross, 439 F. Supp.2d 38 (D.D.C. 2006) (distinguishing the plaintiff's *qui tam* claim from her retaliatory wrongful discharge under §3730(h) of the FCA).  As discussed below, a *qui tam* action requires pleading fraud, but a retaliation claim does not; accordingly, even if Ms. Martin failed to sufficiently plead a *qui tam* case, this would not mean that she failed to sufficiently plead a retaliation claim.

---

[8] A "The Latin phrase, "*qui tam pro se ipso in hac parte sequitur*" means "who pursues this action on our Lord the King's behalf, as well as his own."  *Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1254 (D.C. Cir. 2004).

B.  **Ms. Martin has Sufficiently Pled a *Qui Tam* Action, requiring an Allegation of Fraud, to the Best of her Ability, Prior to Discovery**

A "*qui tam*" action, pursuant to 31 U.S.C. §§3729(a), 3730(b) 3730(d)(1)-(2) of FCA may be brought by a private person with personal knowledge of the violation, who is called the "relator."  The action is intended to reimburse the government, to impose sanctions upon persons or entities that have received government funds based on false claims and to reward the relator for exposing the public fraud.  Once again, *Yesudian v. Howard Univ.*, 153 F.3d 731 provides important precedent for this case.   *Yesudian* clearly explained that claims brought under 31 U.S.C. §§3729(a), 3730(b) 3730(d)(1)-(2).

> The False Claims Act …  imposes a civil penalty and treble damages upon any person who, among other things, "knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval." <u>31 U.S.C. § 3729(a)</u>. <u>Section 3730(b)</u> provides that "private persons," commonly known as "relators," may bring a civil action for a violation of <u>§ 3729</u> "in the name of the Government." <u>31 U.S.C. § 3730(b)</u>.  The statute permits the government to take over the action and conduct it itself, or to decline to take over the action, in which case the relator has the right to conduct it. *See id.*  The relator is entitled to different percentages of any recovery from a successful False Claims Act suit, depending upon whether the relator or the government conducts the action. *See* <u>31 U.S.C. § 3730(d)(1)-(2)</u>.

153 F.3d at 735-736.

A plaintiff may file a FCA lawsuit "by alleging that a defendant 'knowingly made, used or caused to be made, a false record or statement to get a false or fraudulent claim paid or approved by the Government.'" *Williams v. Martin-Baker*, 398 F.3d at 1254.  Ms. Martin has alleged facts that constitute allegations that the Arc "knowingly made, or caused to be made, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  "[A] false claim to the recipient of a grant from the United States or to a State under a program financed in part by the United States is a

false claim to the United States." *Yesudian*, 153 F.3d at 738, quoting the Senate Judiciary Committee.

MRDDA is an agency of the District of Columbia that receives and administers the federal funding intended to aid persons with mental disabilities (Compl. ¶¶5-7)  Ms. Martin has alleged that, in order to obtain federal funding (and, implicitly, to continue that funding each year), the Arc was required to provide certain services for its clients, persons with mental disabilities.  Compl.  ¶15.  *See also* ¶8 (federal funding), ¶9 (D.C. funding).  In order to provide these services, the Arc was required to hire and retain a certain number of trained job coaches, with at least one year experience, to provide these services.  Compl.  ¶15.  Ms. Martin alleged that the Arc did not hire the trained job coaches that it received the funds to hire (Compl.  ¶¶15, 16), thus indicating that the government funds allocated to hire them were fraudulently obtained and/or fraudulently retained.

Ms. Martin also alleged that the Arc had classified clients as able to be placed in jobs, and received funding for training and placing them, when, in fact, they were obviously not able to be placed without further training and/or rehabilitation.  Compl. ¶¶63-68, Ex. E, page 5 "P.S."  As a result, instead of being trained and placed in employment, these clients were sitting in the Arc's waiting area, some in their own excrement, often "calling out," unsupervised, untrained, without recreation, therapy or attempts at rehabilitation.  Compl. ¶¶ 65-67.   Again, these allegations, if proved, indicate that the government funds granted to the Arc for these training were fraudulently obtained and/or fraudulently retained.

Ms. Meccariello's statements and actions create a strong inference, and

substantial evidence, that she was concealing Arc's failure to provide the funded services from the Arc's funding sources so that she would not lose the funding, and thus, her own salary and job.  Since the Arc was refunded each year, the logical inference is that Ms. Meccariello and/or other Arc officials who wrote the Arc's annual funding requests falsified those reports to mislead the government agencies into believing that the Arc was providing the services funded each year.  Ms. Martin has alleged the facts that form the basis of her belief that they are fraudulent.  Ms. Martin never had access to the Arc's actual funding requests or reports to the government submitted to justify funding for the following year, however, she has alleged that the Arc receives both federal and District of Columbia funds to provide services to persons with disabilities.  In order to obtain the government funding, the Arc must apply for funding each year.

Only discovery will disclose whether the Arc falsified its reports and funding applications to the government, but Ms. Martin formed her belief that they were falsified because this is the natural conclusion from the fact that funding was continued each year, despite the Arc's complete failure to supply the services funded to its clients.  After discovery, Ms. Martin can amend her Complaint to plead, with more specificity, the time, place, persons and acts that constitute fraud by the Arc, in its request for federal funding.

### C.  **Ms. Martin is not Required to Allege Fraud to Establish a FCA Retaliation Claim for "Investigating Possible Fraud," and has Properly Pled the Claim**

#### 1.  **The Purpose of the FCA Retaliation Provision**

The FCA, § 3730(h), states:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee ... in furtherance of an action under this section, including investigation for, initiation of,

testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole....

**Since fraud is not an element of a FCA retaliation claim, Rule 9(b) does not apply.**

**This claim is subject only to the general pleading requirements of Rule 8(a).**  Congress intended that §3730(h) of the False Claims Act, prohibiting retaliation for "whistleblowing" "intended to protect employees while they are collecting information about possible fraud." *Williams*, 389 F.3d at 1260, quoting *Yesudian*, 153 F.3d at 741.  The D.C. Circuit has thus held that "it is sufficient that a plaintiff be investigating matters that could reasonably lead to a viable False Claims Act case."  *Id.*  Contrary to Defendant's assertion, in this jurisdiction, the plaintiff is not required to have filed a *qui tam* action, or to have one "in hand," in order prove a retaliation FCA case or to present specific evidence of fraud; it "requires only that the plaintiff have engaged in 'acts in furtherance of an action under this section.'"  *Yesudian*, 153 F.3d at 739, *quoting* 31 U.S.C. §3730(h); see also *Shekoyan v. Sibley Int'l,* 409 F.3d 414, 423 (D.C. Cir. 2005).

Retaliation does *not* require a specific pleading of fraud.  "It is sufficient that a plaintiff be investigating matters that 'reasonably could lead' to a viable False Claims Act case." *Yesudian*, 153 F.3d at 740.

A plaintiff need not even realize that the investigation s/he was pursuing could lead to a False Claims Act claim or have even heard of the False Claims Act or "whistleblowing" statutes.

An initial investigation may well further an action under the Act, even though the employee does not know it at the time of the investigation. Were that not the case, only lawyers-or those versed in the law-would be protected by the statute, as only they would know from the outset that what they were investigating could lead to a False Claims Act prosecution. There is no suggestion in the legislative history that Congress meant to

extend protection only to lawyers, or to others only after they have
consulted with lawyers.

A plaintiff is protected when s/he pursues internal means of addressing the
employer's false claims to the government. *Yesudian*, 153 F.3d at 742.
"Employers should not be discouraged from pursuing internal remedies
before going public." Id. In 1986, in response to concern that employees
who exposed false claims were being punished by their companies,
Congress amended the False Claims Act "to provide for 'whistleblower'
protection." *Id.* at 34, *reprinted in* 1986 U.S.C.C.A.N. at 5299.

*Yesudian*, 153 F.3d at 741.

Totally separate and apart from the requirements of proving a FCA *qui tam* case, to

prevail in a FCA retaliation case, an employee must demonstrate that: (1) he engaged in

protected activity, that is, "acts done ... in furtherance of an action under this section;" and (2)

he was discriminated against "because of" that activity.   In order to establish causation, the

employee must show that:  (a) "the employer had knowledge the employee was engaged in

protected activity;" and (b) "the retaliation was motivated, at least in part, by the employee's

engaging in [that] protected activity."   *Yesudian*, 153 F.3d at 736, reiterated in *Williams*, 363

F3d at 1260.

Any action that might "put the employer on notice that litigation is a reasonable

possibility" satisfies the "knowledge" requirement of §3730(h) of the False Claims Act.

*Williams*, 389 F.3d at 1262.  Some courts have further refined the analysis with respect to

requirement (1)(b), that the retaliation was motivated, at least in part, by the employee's

protected activity, by adding a third prong to the analysis: that the stated legitimate, non-

discriminatory reason for Plaintiff's termination is merely pretext. *Vargas v. Lackmann Foods,*

*Inc.* 2007 WL 1601749 at *7-8 (M.D. Fla. 2007), citing *Mann v. Olsen Certified Healthcare*

*Corp.*, 49 F. Supp.2d 1307, 1317 (M.D.Ala. 1999).

The key inquiry is whether a factfinder could reasonably conclude that the

employer could have feared that the employee was contemplating filing a
*qui tam* action against it or reporting the employer to the government for
fraud.

2007 WL 1601749 at 7.

Ms. Martin has met the requirements of a pleading a retaliation claim, under §3730(h),
for wrongful discharge because she has alleged facts that Ms. Meccariello fired her because she
was afraid that she would report Arc to federal and/or D.C. government for misusing
government funds and fraudulently concealing it.

### 2.  Ms. Martin has Pled the Elements of a FCA Retaliation Case

#### a)  Ms. Martin Engaged in Protected Activity

Ms. Martin engaged in protected activity when she discussed issues of the Arc's failure
to provide the services financed by the United States government with Mr. Washington and
Mr. O'Connner, of MRDDA, the agency administering federal and D.C. funds, including a
requisite number of job coaches, as well as other areas of non-compliance with the Arc's
obligations under the funding contract.  In addition, Ms. Martin was investigating "possible
fraud" by investigating the Arc's classifications of persons that it had represented to the
government were trainable and ready to be placed in gainful employment, when they were
obviously not even able to control their own excrement or their behavior, without "calling out."

#### b)  The Arc had Knowledge of Ms. Martin's Protected Activity

Ms. Meccariello was fully aware of Ms. Martin's protected activities when she
fired her.   In her Grievance regarding Ms. Graham, Ms. Martin discussed her "close
contact" with Mr. Washington, and conversations with Mr. O'Conner, of MRDDA, the
funding agency. Compl. Exhibit D.  Ms. Martin detailed her involvement with a client,
above and beyond her job duties, demonstrating that she would operate as a mediator

between the government, clients, their attorneys and the clients' employers, all as necessary to assist the client. *Id*. Ms. Martin also expressed her compassion and concern for the welfare of those clients, who were sitting and suffering rather than being trained, placed, or simply cared for in a comfortable environment. *Id.* Compl. ¶¶ 63-68. Ms. Meccariello had every reason to believe that this conscientious employee would not sit by, day after day, and watch this suffering without reporting it to government officials, particularly since she was already developing working relationships with some of them, such as Mr. Washington and Mr. O'Conner.

### c)   The Arc Fired Ms. Martin because of her Protected Activity

Where a plaintiff's termination or suspension was "swift," that is, "just after" the employer becomes aware that the employee may "blow the whistle" on it, the plaintiff has established a causal connection between the protected activity and the adverse action. *Williams*, 389 F.3d at 1262. Allegations to this effect are sufficient to sustain a claim of retaliation. *Id.* Since Ms. Meccariello fired Ms. Martin only two days after she filed her Grievance, raising the issues of the Arc's non-compliance with its federal funding requirements, and during the same meeting, wherein they discussed those issues, Ms. Martin has established a causal connection between her protected activity and her termination.

In addition to the timing of Ms. Martin's termination, Ms. Meccariello told Ms. Martin that she was being fired because she was "not a team player." Compl. ¶18. Ms. Meccariello also told her that Ms. Martin that she was a "mover and a shaker," which she admired, but that those qualities were not compatible with the Arc's needs at that time. Compl. ¶ 23. Ms. Martin was initially hired for these very qualities (Compl. ¶ 23); however, Ms. Meccariello's comments indicate that she had come to realize that a "mover and a shaker," who might act

based on her own conscience, could not be a member of a "team" that concealed its activities to continue to receive funding, under false pretenses.  The court in *Yesudian* found similar statements by the plaintiff's supervisor to constitute evidence of retaliatory termination.  Mr. Yesudian's supervisor had told him "If you do this kind of stuff, you're not going to be in this department."

Instead of correcting the deplorable conditions that the Arc actually *created and maintained* for the persons with mental disabilities, Ms. Meccariello berated Ms. Martin and instructed her to conceal the Arc's conduct from the funding agency.  Compl. ¶¶ 20, 21.  Ms. Meccariello specifically forbade Ms. Martin from discussing these issues with any agent of a funding source, such as Mr. Washington or Mr. O'Conner, of MRDDA.  Ms. Meccariello's statements and immediate termination of Ms. Martin, in the context of discussing the Arc's failure to comply with its funding requirements and Ms. Martin's "close contact" with Mr. Washington, of MRDDA, as described in her Grievance, constitutes strong evidence that Ms. Meccariello was afraid that Ms. Martin would "blow the whistle" on the Arc to its federal funding source.

A jury could certainly conclude, from evidence proving Ms. Martin's allegations, that Ms. Meccariello fired Ms. Martin to continue to conceal the Arc's false representations regarding its compliance with its funding contract from the government.  This is particularly true where the employer has violated its own progressive discipline policy in terminating the employee and has never alleged that there was "cause" for her discharge.

## VI. **Plaintiff's Allegations Constitute a Claim of Intentional Infliction of Emotional Distress (IIED)**

The Arc claims that the conduct perpetrated against Ms. Martin by Ms. Meccariello is not "outrageous" enough to constitute a claim of intentional infliction of

emotional distress.  In fact, the Arc argues that, "as a matter of law," occupational based

issues "cannot" provide the basis for an intentional infliction of emotional distress claim,

citing *Kassem v. Washington Hosp. Center*, 2006 WL 2474098 (D.D.C. 2006).  Once

again, Defendant has misrepresented the law, and particularly, this case.  *Kassem*, *via*

Judge Robertson, explicitly states:

> And, while it would be unwise to conclude that no plaintiff could ever
> state a claim for IIED based on purely occupational behavior, the facts in
> this case parallel those in *Kerrigan*[9] so closely that describing one and not
> the other as outrageous makes no sense as a matter of law.

*Kassem,* 2006 WL 2474098 at 4.

In fact, Judge Robertson specifically recognized that the law in this area was

inconsistent.  WL 2474098 at 3.  Judge Robertson did not just discuss cases that dismissed

IIED claims that arose out of occupational conduct, such as Judge Hogan's decision in

*Wade v. Washington Metropolitan Area Transit* Authority, 2005 WL 1513137 at *6; he

also acknowledged cases that upheld these claims, such as *Larijani v. Georgetown*

*University,* 791 A.2d 41, 43 (D.C. 2002).  Judge Robertson even described choosing

between the opposing views on this issue "difficult."

Judge Robertson may not have been aware that, only two months earlier, Judge

Oberdorfer had upheld a claim of intentional infliction of emotional distress based on

purely occupational grounds, *Mintz v. District of Columbia,* 2006 WL 1518954 at *5-6

(D.D.C. 2006).  Judge Oberdorfer permitted the plaintiff's intentional infliction of

emotional distress claim against his former employer to proceed to a jury based on the

following actions taken against him by his employer: The actions taken against Mr.

---

[9] *Kerrigan v. Britches of Georgetown, Inc.,* 705 A2d 624, 628 (D.C. 1997), decided ten years
ago and *Howard Univ. v. Best*, 484 A.2d 958, 986 (D.C. 1984), decided twenty-three years ago,
and also relied on by Judge Robertson, may not reflect the current, 2007 standard for

Darbeau that could constitute intentional infliction of emotional distress are: 1) he was given one year renewable contracts, instead of permanent employee status; 2) he was denied certain training benefits; 3) his desk was placed in an undesirable, noisy, isolated location; and 3) finally, the employer failed to renew his contract, despite superior performance evaluations. [10]

Contrary to Defendant's representations, then, this Court is not faced with a mandate to dismiss Ms. Martin's IIED claim, "as a matter of law;" this Court, like Judge Roberts in *Kassem*, Judge Oberdorfer in Mintz and Judge Hogan in *Wade*, must choose between two viable theories of IIED. Both positions are supported by precedent in this Court. Each case supplies additional precedent and analysis that helps to shape the law on this issue; accordingly, Plaintiff offers the following additional analysis, including authorities outside of this court, to assist in this decision.

In defining "outrageous," the court should consider the nature of the activity, the relationship between the parties, the duties of the parties, and the prevailing norms of society. *Woodner v. Breeden*, 665 A.2d 929, 935 (D.C. Ct. App. 1995). "The extreme and outrageous character of the Defendant's actions may arise from his abuse of a position of authority over him, or power to affect Plaintiff's interests." *Harris v. Jones*, 281 Md. 560, 566 (Md. Dec 09, 1977, quoting *Restatement of Torts*, Section 46.

> Specific intent to cause harm is not required. Reckless infliction of emotional distress is sufficient...Liability "extends to situations in which there is no certainty, but merely a high degree of probability, that the mental distress will follow, and the defendant goes ahead in conscious

---

"outrageous" behavior toward an employee by an employer.

[10] The intentional infliction of emotional distress claim was not brought by the original named plaintiff, Mr. Mintz, but rather, by the second plaintiff, Selwyn Darbeau. Mr. Mintz prevailed on his *Motion for Summary Judgment* on his Title VII hostile work environment claim and was permitted to proceed to trial on his discharge claim.

disregard of it."

Restatement, supra, § 46 comment i.

Where an employer supports an employee who commits misconduct and/or an act against another employee, that conduct is imputed to the employer.  An employer's retention of an employee who has committed a tort constitutes ratification of the tortuous conduct.  *Prunty v. Arkansas Frieghtways,* 16 F.3d 649 (5th Cir. 1994).  By failing to remove or otherwise reprimand Annetta Graham for her vulgar insult and refusal to work with Ms. Martin, the Arc must be held liable for her actions, based on *respondeat superior* and its own actions, with respect to its ratification and support of it.

It is *unacceptable*, in a civilized society, to respond to a co-worker by saying, "Fuck you, Lowry," and refusing the address the important issue at hand.  It is even more unacceptable that The Arc, through its Director, Ms. Meccariello, encouraged and ratified Ms. Graham's outrageous conduct by retaining Ms. Graham, failing to discipline her, and actually *firing* Ms. Martin – the *innocent* party.  It is even more unacceptable, in a civilized society, to punish and employee for attempting to correct practices that are abusive to persons with mental disabilities – one of the most vulnerable segments of the population – or for attempting to correct a fraud upon the taxpayers.

Because Ms. Meccariello had complete control over Ms. Martin's livelihood and workplace, the emotional distress that she could -- and did -- inflict upon Ms. Martin was severe.  Ms. Martin had to choose between becoming part of a system that abused persons with mental disabilities while it was being paid to assist them, or to jeopardize her ability to support herself and her teenage daughters.  Moreover, by keeping persons with mental disabilities confined to its facility, day after day, for no productive or

recreational purpose, the Arc was actually making life *worse* for its clients, rather than better.  The beneficiaries of the funds were, therefore, only the persons whose salaries were being funded by the government.

"Actions which violate public policy may constitute outrageous conduct sufficient to state a cause of action for infliction of emotional distress."  *Howard University v. Best,* 484 A.2d 958, 985 (D.C. App. 1984), *modified on other grounds*, 547 A.2d 144 (D.C. App. 1988).[11]  Indeed, Donald Exner, Esquire, the attorney/guardian for Cartina clearly found it "outrageous" that the Arc's demonstrated such callousness toward his client, Cartina, and discharged Ms. Martin, the only person at the Arc who helped her, effectively, *for* helping her.  See **Exhibit 1,**[12] Declaration of Donald Exner, Esquire.  Mr. Exner summed up his sentiments in his final paragraph, ¶ 15:

> **I was very disappointed when I learned that Ms. Lowry Martin was no longer employed by D.C. ARC.  I believe that she was very sincere in getting Cartina into supportive employment.  As I said earlier, she was able to accomplish what no one else had accomplished for 14 ears, despite many promises to do so.  Now she is gone!  Who is going to help Cartina?**

Who is going to help Cartina – or Ms. Martin for trying to help Cartina?

Certainly, reasonable jurors could share Attorney Exner's sentiments, once learning the

---

[11] For example, the same conduct that constitutes sexual harassment in the workplace may also constitute a claim for intentional infliction of emotional distress.  *Id.*

[12] See also exhibits 2-6 for additional commentaries on the difference that Ms. Martin made in the lives of persons with mental disabilities at the Arc.  For example, in her Declaration, Exhibit 3, ¶ 6.  Attorney Karen Kruger, guardian for another Arc client praised Ms. Martin for placing her client, after years of wrote:

> In the thirteen years I have known Milton, I have never seen him so happy or fulfilled.

Exhibits 4-6 are from additional guardians/parents of persons with mental disabilities with similar gratitude for Ms. Martin's contributions to their lives.

facts at trial.  A jury should determine whether Ms. Meccariello conduct met the

"outrageous" standard and wrongfully discharged Ms. Martin, in violation of public

policy, and whether she is entitled to some remedy for this wrong.


                              Respectfully submitted,


                              Dawn V. Martin, Esquire
                              Federal Bar Number 412348
                              *Law Offices of Dawn V. Martin*
                              1725 I Street, N.W. Suite 300
                              Washington, D.C. 20006
                              (202) 408-7040 telephone
                              (703) 642-0208 *facsimile*
                              DVMARTINLAW@yahoo.com
                              www.dvmartinlaw.com

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
                                                )
**Lowry Martin,**                               )
             Plaintiff,                          )    Civil Action No. 05-01411
             v.                                  )     EGS
                                                )
**The Arc of the District of Columbia**          )
             Defendant.                          )
———————————————————————)

**ORDER**

Upon consideration of *Defendant's Motion to Dismiss, Plaintiff's Opposition* and the

entire record herein, *Defendant's Motion to Dismiss the Complaint*, is **DENIED**.

**SO ORDERED.**

                                        ——————————————————
                                        The Honorable Emmet G. Sullivan
                                        U.S. District Court for the District of Columbia