**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                            )
**Lowry Martin,**                           )
        Plaintiff,                   )       Civil Action No. 05-01411
        v.                          )        EGS
                                            )
**The ARC of the District of Columbia**     )
        Defendant.                  )
_____)

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION**
**FOR RECONSIDERATION DISMISS AND CROSS MOTION FOR**
**RECONSIDERATION, PURSUANT TO RULE 60(b)(6)**

Plaintiff Lowry Martin opposes *Defendant's Motion for Reconsideration* of this Court's

denial of its motion to dismiss Ms. Martin's breach of contract claim.  In addition, in light of two

U.S. Court of Appeals, D.C. Circuit decision decided after the parties filed their dispositive

pleadings, Ms. Martin respectfully asks that the Court reconsider its decision to dismiss her

claims of intentional infliction of emotional distress and permit her to amend her Complaint to

include a claim of wrongful discharge.  The new case law justifies a Motion for Reconsideration,

pursuant to Rule 60(b)(6).

The most recent case, *Khan v. Parsons Global Services, Ltd.*, --- F.3d ----, 2008 WL

996510 (D.C. Cir. 2008), was decided on April 11, 2008 – two weeks after this Court issued its

decision in the present case.  *Khan* reversed the district court's dismissal of a plaintiffs'

intentional infliction of emotional distress (IIED) claim and further refined the definition of such

claims in the context of an employment relationship.

The second case, *Kassem v. Washington Hospital Center*, 513 F.3d 251 (D.C. Cir. 2008)

was decided on January 22, 2008.  In *Kassem*, the U.S. Court of Appeals for the D.C. Circuit

reversed the district court's dismissal of an IIED claim.  When the Defendant filed its June 14, 2007 *Motion to Dismiss* (Dkt. # 17), it expressly relied on *Kassem* to justify dismissal of Ms. Martin's IIED claim.  This Court did recognize the recent decision in *Kassem* in its March 28, 2008 *Memorandum Opinion*, however, Ms. Martin believes that *Kassem* provides her with arguments that support her Complaint with respect to both her intentional infliction of emotional distress and related wrongful discharge claim and requests that she be given the opportunity to present these arguments.  *Kassem* also presents arguments justifying a claim for wrongful discharge in this case.  Since Ms. Martin's statutory "whistleblower" claims were dismissed, the tort of wrongful discharge may be applied to the case under *Kassem*.

**I.   This Court Correctly Upheld Ms. Martin's Breach of Contract Claim**

>    **A.   The Court Properly Denied Defendant's Motion to Dismiss since Relevant Evidence is in the Sole Possession of Defendants**

This Court properly refused to dismiss Ms. Martin's breach of contract claim, on a *Motion to Dismiss*, based on a provision in the ARC's Handbook, conflicting with its specific progressive discipline and grievances provisions.  In order to assess whether the Handbook's provision stating that employment is "at will" renders the written progressive discipline and grievances policies in the same Handbook null and void, the court must make certain factual determinations based on evidence not before the Court at this time.

At the pleading, or motion to dismiss stage, plaintiffs, without the benefit of discovery, may not have access to the specific documents or information that prove the claim.  153 F.3d at 740; *Williams v. Martin-Baker*, 398 F.3d at 1258, citing *Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1279, n. 3 (D.C. Cir. 1994) and *Harris v. Bernad*, 275 F. Supp.2d 1, 8-9 (D.D.C. 2003).  In fact, plaintiffs in employment cases are often

severely disadvantaged in pre-discovery dispositive motions because the defendant usually has "possession and control" of the relevant documents and testimony that might prove the plaintiff's case.  See, *Khan,* 2008 WL 996510 at *5 (defendant employer had no need for discovery to file a dispositive motion, since it already had possession and control of all of the material evidence).

As this Court, *via* Judge Sullivan, held, "A contract is enforceable if it is 'sufficiently definite so that the parties can be reasonably certain as to how they are to perform.'" *Monument Realty LLC v. Washington Metropolitan Area Transit Authority*, -- 535 F.Supp.2d 60, 68-69 (D.D.C. 2008)   Discovery is expected to reveal that the ARC's past and part performance with respect to its implementation of its own Handbook.  A party may be bound, based on part or past performance, to a contract, under the theory of promissory estoppel.  535 F.Supp.2d at 72.  "There must be evidence of a promise, the promise must reasonably induce reliance upon it, and the promise must be relied upon to the detriment of the promisee."  *Id.*

The ARC's written grievance procedures and progressive discipline policy, constituted a promise to its employees that they could file good faith grievances without retaliation and that they would not be terminated without warning and opportunity for improvement unless they had committed serious misconduct, as defined by the Handbook.  The ARC has never alleged that Ms. Martin committed any misconduct *of any kind* -- serious or minor, nor has there ever been any allegation that she failed to perform her duties in a satisfactory manner.  In fact, the ARC never challenged her application for unemployment benefits or otherwise implied, in any way, that she was fired for "cause."  She therefore had a reasonably expectation that she was entitled to file

a valid grievance without being terminated for it.

The ARC's Handbook demonstrates that the ARC intended to be bound by its terms. The Handbook created an expectation by its employees that the ARC would abide by the written personnel policies. Ms. Martin is entitled to discovery on the issue of past practices and employee expectations created by the Handbook. In discovery, she should be provided documentation of grievances processed by the ARC and terminations of employees, for a reasonable period of time prior to Ms. Martin's grievance and termination. She is also entitled to depose persons regarding these past practices and the reasonable employee expectations created them. Particularly if the ARC's past performance demonstrates that it generally honored its own grievance and progressive discipline policies, then Ms. Martin can demonstrate that she reasonably relied on the policies set forth in the ARC's Handbook, *was induced by the ARC* to rely on it, and reasonably relied on it, to her severe detriment – costing her job and livelihood.

As discussed below, and as was discussed in Plaintiff's July 2, 2007 *Opposition to Defendant's Motion to Dismiss* (Dkt. # 19), pages 16-25 (incorporated herein by reference), the grievance and progressive discipline policies in the Handbook are not rendered null and void based on its provisions elsewhere in the Handbook, that: 1) employment with the ARC is "at will;" 2) the employer/employee relationship may be terminated at any time for any reason by either party;[1] and 3) statements in the Handbook do not constitute a promise of continued employment.

---

[1] This statement is invalid, as a matter of law, in any case. There are many reasons that an employer cannot use to terminate a person. For example, termination on the basis of race, color, sex, national origin, religion, color would be prohibited by Title VII of the Civil Rights Act of 1964. Similarly, failure to reasonably accommodate a qualified person with a disability would violate the Americans with Disabilities Act. Termination on the basis of age would violate the Age Discrimination in Employment Act. Certain circumstances would give rise to a breach of contract The False Claims Act protects

**B.  The ARC's Personnel Handbook Created an Expectation that they Could File Grievances without Retaliation and be Terminated only for "Cause"**

In her *Opposition to Defendant's Motion to Dismiss*, pages 16-22,  Ms. Martin thoroughly discussed the case law holding that conflicting provisions of a Handbook. One providing for a progressive discipline termination policy and another stating that employment is terminable "at will," creates a jury question as to whether the employer has created an expectation among its employees that they will not be terminated without cause and or warning.  This result is consistent with the well-established principle of contract law, that any ambiguity or inconsistency in a contract is construed against the drafter.  Here, the ARC was the drafter of its own Handbook.  Any ambiguity in its Handbook should be construed against it – at least for purposes of a *Motion to Dismiss*, prior to discovery.

On pages 5-6 of its *Motion to Dismiss*, and again, in its *Motion for Reconsideration*, the ARC argues that it had no obligation to follow its own progressive discipline policy, as set forth in its own extensive Personnel Policies Manual; therefore, it argues that Ms. Martin has no remedy at law for its blatant violation of its own Manual.  In its *Motion to Dismiss*, the ARC relied on only one case: *Taylor v. Washington Metro Area Transit*, 922 F. Supp. 665 (D.D.C. 1999), a nine-year old District Court decision.  As discussed in Plaintiff's *Opposition to Defendant's Motion to Dismiss*, and below, Defendant's representation of *Taylor i*s much less than forthright – as is its omission of any citation to controlling decisions of the U.S. Court of Appeals for the D.C. Circuit or the body of District Court decisions that have been decided within the eight years since *Taylor* was decided.

In its *Motion for Reconsideration*, Defendant relies on only one case – this time, not *Taylor*, but *Boulton v. Institute of International Education*, 808 A.2d 499 (D.C. App. 2002);

---

whistleblowers from termination.

however, Defendant's representation of the pronouncement in *Boulton* is incomplete and

misleading – even though Ms. Martin specifically addressed *Boulton* in her *Opposition to*

*Defendant's Motion to Dismiss,* page 20, fn. 5.  In *Boulton,* the employer's Handbook stated

that "every effort" would be made to ensure job security and to locate another suitable position

for an employee whose job is eliminated.  This non-specific language was held not to conflict

with the Handbook's simultaneous provision stating that the company could end an

individual's employment "at its discretion" and did not contradict the "at will employment

doctrine."  Defendant also fails to acknowledge that *Boulton* also held that: "[a] mere statement

that the employee handbook is not a contract does not necessarily settle the matter."  808 A.2d

at 504.

      As Ms. Martin discussed in her *Opposition*, in *Yesudian v. Howard Univ*., 153 F.3d at

745-748, the D.C. Circuit Court of Appeals held that the Howard University Handbook,

including detailed grievance and termination procedures, converted the employment

relationship from an "employment at will" status to a contract. The employer, Howard

University, was therefore obligated to follow its own stated disciplinary, termination and

grievance procedures.   *Yesudian* specifically rejected Howard's argument that its disclaimer,

maintained the "at will" employment relationship. 153 F.3d at 745 at 745.   The Handbook's

statement, that management reserved the right to "discipline or discharge employees for any

other cause," was "insufficient" to rebut the contradictory language of the Handbook that led

employees to believe that they could only be discharged for "cause" and then, only in

accordance with certain procedures.  *Id*.  The Court of Appeals found that:

> the jury was justified in finding that the plaintiff reasonably relied on the
> provisions of the employee handbook to his detriment in that he followed the
> handbook grievance procedures at the expense of much time and money.

*Id.*

The D.C. Court of Appeals repeatedly held that a personnel manual can modify the employment at will doctrine, even where the Manual also contains a disclaimer that the policies do not modify the employment at will doctrine. Where the Manual provides preconditions for termination, such as a progressive discipline policy or certain grounds for termination, the employee "could reasonably expect that the application of this policy was required before termination." This reasonable expectation created a contract and altered the "at will" doctrine. 744 A.2d at 1011-1014.

In 2000, the District of Columbia Court of Appeals held that:

> The terms of an employer's personnel or policy manual may be sufficient to raise a jury question as to whether the manual creates contractual rights for the employee.

*Strass v. Kaiser Foundation Health Plan*, 744 A.2d 1000, 1011 (D.C. 2000), *citing Nickens v. Labor Agency of Metro Washington,* 600 A.2d 813, 817 (D.C. 1991); *Washington Welfare Ass'n*, Inc. v. *Wheeler,* 496 A.2d 613, 615 (D.C. 1985). The Court of Appeals further held that:

> This court has held that a personnel manual that states specific preconditions that must be met before the employment will be terminated is sufficiently clear to rebut the presumption of at-will employment.

*Strass*, 744 A.2d at 1013, *citing Rinck v. Association of Reserve Bankers,* 676 A.2d 12, 16 (D.C. 1996) and *Wheeler*, 496 A.2d at 616. The court proceeded to hold that the progressive discipline policies in the employer's Manual that "established preconditions to termination" could rebut the presumption of the "at-will" employment doctrine and create contract rights for the employees. *Strass*, 744 A.2d at 1014, citing *Sisco,* 689 A.2d at 57. As in the present case, the Personnel Manual in *Strass* specifically stated that the Manual did not constitute a contract

with employees; however, the court held that this statement was not determinative because it was "at odds" with other language in the document, specifically, but not limited to, the progressive discipline policy.  744 A.2d at 1013.[2]

The Court of Appeals reiterated its *Strass* analysis in *Dantley v. Howard University*, 801 A.2d 962, 965 (D.C. 2002).  Despite language in the Handbook stating that the Handbook does not create a contract with the employee, this conclusory statement was not dispositive of the issue the disclaimer conflicted with the termination policy set forth in the same Manual. 801 A.2d at 965.  The U.S. Court of Appeals for the D.C. Circuit has acknowledged that *Strass*, *Sisco, Nickens* and *Rinck* set forth the appropriate criteria and analysis for determining the circumstances under which an employer's personnel manual will suffice to overcome the presumption of an "at will" employment relationship.  *Byrne v. National Railroad Passenger Corporation*, 184 Fed.Appx 6 (D.C. Cir. 2006).

This Court applied *Strass* in *Austin v. Howard University*, 267 F. Supp.2d 22, 25-28 (D.D.C. 2003), to hold that the inclusion of a contractual disclaimer "does not inevitably led to the conclusion that an employer is relieved of any obligation to comply with the manual's terms."  267 F. Supp.2d at 1011-1012.  Quoting *Strass*, *Austin* held:

> All told, we think … that assurance by an employer in a personnel or policy manual distributed to all employees that are clear enough in limiting the right to terminate to specific causes or events will overcome the presumption of at-will employment.  Such a promise … creates a triable issue of fact as to the

---

[2] The Court of Appeals for the District of Columbia reiterated its holding in *Strass* in *Futrell v. Department of Labor Federal Credit Union,* 816 A.2d 793, 807 (D.C. 2003), although, applying the facts, it arrived at a different disposition than it did in *Strass*.  816 A.2d at 808.  In *Futrell*, the plaintiff was not within the class of non-managerial employees that the Handbook addressed.  In addition, the Handbook did not include any specific preconditions that had to be met prior to termination.  Finally, Ms. Futrell admitted, in her deposition, that *she understood that the Employee Handbook did not create an express or implied contract*.  In light of these facts, there was no basis for a jury to determine that Ms. Futrell *believed* that she was working under an employment contract that guaranteed her certain procedural and substantive safeguards against termination at will.

existence of an implied contract for continued employment.  In effect, promises
meeting this test reverse the normal presumption…

The Court continued:

The Handbook states that it is "not to be construed as a contract." …  The
inclusion of provisions which establish preconditions to the termination of a
regular employee, however, suggests the opposite.

267 F. Supp.2d at 28.  The Court then observed that the defendant "apparently took no

steps to satisfy the Handbook's preconditions for termination."  *Id*.

An employee who reads a personnel handbook, including specific procedures and

conduct with which the employee must conform, as well as specific conditions and

procedures for discipline and termination, would reasonably believe that the employer

would follow its own written policy.  Holding otherwise either renders an Employee

Handbook meaningless or creates a unilateral contract, enforceable against the employee,

but not against the employer.  The employer should not be permitted to mislead

employees into believing that they have procedural safeguards and will be warned of

perceived misconduct or deficiencies, if the employer is, in fact, under absolutely no

obligation to adhere to its own written representations to its employees.   Certainly, a

reasonable juror to conclude that the parties intended each to be bound by the terms of its

own Personnel Handbook, creating a valid contract.

In *Youngblood v. Vistronix, Inc.*, 2006 WL 2092636 (D.D.C. 2006), this Court applied

the *Strass* criteria to an employment relationship and assessed whether the Employee

Handbook's "disclaimer," asserting that an employee could be terminated with or without

cause" was "at odds" with its written disciplinary portion of its employee Handbook.  The

court determined that there was no conflict because the Handbook used the permissive

language "may," as contrasted with the word "shall," which was used in the employer's

Manual in *Strauss*.  The Court held:

> In *Strass*, the D.C. Court of Appeals found a rational opposition between the presence of a disclaimer and the use of the word "shall."  *Strass,* 744 A.2d at 1013.  If a party "shall" do something, it makes little sense for the party elsewhere to say that it might not do it.  If a party "may" do something, however, it also may not do it.  Vistronix may disclaim an implied contract as to disciplinary measures on the grounds that the language describing those measures does not actually require that they be employed.

2006 WL 2092636 at *3.[3]

In contrast to the disciplinary policy in *Vistronix*, the ARC's policy, like the policy in

*Strass*, uses the mandatory language "will" and "is" rather than permissive language such as

"may."  As in *Strass*, it makes no sense" for the employer to state, in its Personnel Manual that

it "will" do something and elsewhere, to state that it "might not do it."  The ARC, like the

employer in *Strass*, should be held to the terms of its own Personnel Manual after leading its

employees to believe that it would follow that Manual.

### 1. *Taylor* is Distinguished from *Martin*

Even in *Taylor*, this court acknowledged that the presumption of an "at will"

employment relationship can be rebutted by evidence that the parties intended the employment

to be "subject to specific preconditions before termination." 922 F.Supp. at 674.  The court's

dismissal of Mr. Taylor's claims turned on the facts – which are markedly distinguished from

the case at bar.  In *Taylor*, copies of the Personnel Manual were not routinely distributed to all

employees; the plaintiff only had one because he was a supervisor.  922 F. Supp. at 674.

Employees therefore could not claim that they even knew what about any termination policy in

the Manual, let alone claim that they accepted the terms as part of their employment contracts.

---

[3] Accord, *Powell v. American Red Cross*, 2007 WL 1723656 at *15 (D.D.C. 2007) (Human Resources Policy and Procedure Manual's use of the word "may" constitutes permissive language

As distinguished from *Taylor*, the ARC's Manual, Section 1.2, entitled "**Authority and Distribution of Manual,**" specifically required that *all* employees be provided a copy of the Manual, within 7 days of commencement of their employment, and that the terms of the Manual be explained to all new employees "when they attend the Orientation Program." Def.'s Ex. 1, page 9. In fact, Ms. Martin attended the ARC's Orientation Program on her second day on the job.

The ARC contends that because Ms. Martin gave no consideration for the Handbook's promises, no binding obligation was created; however, where an employee remains with an employer "after receipt of a personnel manual promising job security supplies the necessary consideration to make the promise legally enforceable." *Yesudian v. Howard Univ*., 153 F.3d 731, 748 (D.C. Cir. 1998), *quoting Sisco v. GSA Nat'l Capital Fed. Credit Union,* 689 A.2d 52, 56 (D.C. 1997). Because Ms. Martin remained with the ARC after receiving the Handbook, she satisfied the *Yesudian*/*Sisco* requirement.

The detailed, single-spaced, 36 page Personnel Manual clearly set forth a detailed, *mandatory* procedure that supervisors were obligated to follow before terminating or otherwise disciplining an employee, and under what conditions such discipline could be administered. Employees knew that they were expected to conform to the requirements of the detailed, conversely, they had a reasonable expectation that the ARC would follow its own Manual, particularly with respect to material employment conditions such as termination, discipline and grievances.

Finally, and quite significantly, the defendant in *Taylor* actually *did* comply with its own procedures set forth in its Manual. The *Taylor* court made this specific factual finding to justify its decision "even if the Manual could be found to constitute an employment

---

and does not create contract right to severance pay).

contract…"[4]  922 F. Supp. at 674.  In the present case, Ms. Martin has alleged, and will prove

if permitted to present her evidence, that the ARC blatantly and flagrantly violated its own

Manual, including its progressive discipline policy, its grievance procedures and termination

policy, without "cause."

2.  **The ARC Violated its own Written Policy by Firing Ms. Martin,
Particularly its Progressive Discipline, Termination and Grievance
Provisions**

The ARC set forth a detailed progressive discipline policy in its Personnel Manual, §

10.1-10.3.  Def's Exhibit 1, pages 12-18.  The Manual sets forth the specific conduct for which

an employee will be disciplined, including "Simple Misconduct" and "Gross Misconduct."

Manual, § §10.2.1 and 10.2.2.  The Manual, § 10.2 states:

> The degree of disciplinary action taken **is** dependent on whether the
> misconduct is considered "simple," as a series of minor rules or policy
> violations or "gross," a serious rule or policy violation.  (Emphasis added)

The Manual then proceeds to set forth a progressive disciplinary policy for misconduct

that does not constitute "gross misconduct," which may result in immediate termination.

Sections 10.3.1-10.3.5 lists the stages of the progressive disciplinary policy.  The first is a

"verbal warning," which states that the immediate supervisor "will" review concerns with the

employee and "will" keep a record of the verbal warning.  Section 10.3.1.  Next, is a "written

warning," which states that the supervisor "will" put the concerns in writing.

Section 10.3.2, entitled "Return to Probationary Status" and Section 10.3.4,

"Suspension without Pay" provides the supervisor with the discretion to take either of these

actions, as exhibited by the permissive use of the word "may."  The contrast between these

provisions and the other steps in the progressive discipline policy clearly demonstrates that the

---

[4] Arguably, the *Taylor* Court's conclusion that there was no contract was simply *dicta*, rather
than a necessary finding to reach its holding.

ARC knew the difference between permissive and mandatory language and deliberately used the mandatory language in the other sections.

The Manual returns to the mandatory "will" language under § 10.3.5, entitled "Discharges:"

> If an employee is discharged due to reasons of gross misconduct or as the final step in the progressive disciplinary process, he/she **will** be notified in writing. All discharges must be approved by the Executive Director. Reasons for the discharge **will** be documented and made part of the employee's personnel file. (Emphasis added)

Ms. Martin was not discharged for cause, or pursuant to the progressive discipline policy, nor was she notified in writing of her discharge, or even provided with any written reason for her termination. Instead, she was fired, verbally, by the Executive Director, in a meeting in which she was called, purportedly, to discuss her grievance against another employee.

### 3. **The ARC's Grievance Policy**

The ARC violated its own Grievance Policy, specifically set forth, in increment steps, in § 9 of its Manual. Def's Exhibit 1, pages 10-11. The language in the Grievance Procedure is even more emphatically mandatory than is the language in the progressive discipline Section. Section 9 uses "must" repeatedly to state what both the employee and the supervisor must do with respect to filing, investigating and responding to grievances at each step of the process; yet, without explanation, the ARC failed and refused to process Ms. Martin's grievance, although she followed the mandatory procedure set forth in the Manual, § 9. Instead, the Director, Mary Lou Meccariello, verbally chastised her for writing it, and, inexplicably, immediately imposed the ultimate penalty of termination on her for filing it.

Although taking a different form, Ms. Martin, like the plaintiff in *Yesudian*, lost substantial time and money because of their employers' breach of contract with respect to the grievance process. Ms. Martin actually lost her job and her income, immediately, with children at home to support and her former job, from which the ARC recruited her, now filled and unavailable. Ms. Martin is entitled to proceed to trial to allow a jury to decide whether the ARC breached its contract with her when it ignored its own progressive discipline and grievance policies and terminated her without cause.

## II. *Khan* and *Kassem* Support the Reinstatement of Ms. Martin's Claim of Intentional Infliction of Emotional Distress

As this Court stated in its March 28, 2008 Memorandum Opinion, page 19, the claim of intentional infliction of emotional distress (IIED) consists of "(1) extreme and outrageous conduct on the art of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.

When the dispositive pleadings were filed in June and July of 2007, Defendant relied on the district court decision in *Kassem v. Washington Hospital Center*, 2006 WL 2474098 (D.D.C. 2006), arguing that argues that, "as a matter of law," occupational based issues "cannot" provide the basis for an intentional infliction of emotional distress claim.[5] On January 22, 2008, however, *Kassem* was reversed. 513 F.3d 251 (D.C. 2008). The D.C. Circuit Court of Appeals held:

> It is correct that "generally, employer-employee conflicts do not rise to the level of outrageous conduct" required to satisfy the first element of an IIED claim… If the conduct at issue is otherwise outrageous, however, a plaintiff's "status as an employee does not materially affect the sufficiency of her complaint." (Citations omitted.)

---

[5] As Ms. Martin pointed out in her *Opposition to Defendant's Motion to Dismiss*, at ___, Defendant misrepresented the holding as an "absolute," whereas it was a qualified holding, acknowledging that there may be some instances where occupational issues might rise to the level of being "outrageous" and constitute a claim of intentional infliction of emotional distress.

513 F.3d at 255.

Kassem also expressly adopted the court's rationales in *King v. Kidd,* 640 A.2d 656, 677-78 (D.C. 1993). *Id.* In *King*, a supervisor allegedly retaliated against an employee who complained of sexual harassment. In addition to her Title VII claims, the court held that she had a separate and distinct claim of intentional infliction of emotional distress. The court found that a reasonable jury could find the supervisor's alleged conduct to be "outrageous" and that these unacceptable, retaliatory terms and conditions of employment were not "typical employer-employee conflicts." 484 A.2d at 986. The *Kassem* Court similarly adopted the rationale in *Howard Univ. v. Best*, 484 A.2d 958, 986 (D.C. 1984), holding that a plaintiff who was sexually harassed by her supervisor could sustain a separate claim of intentional infliction of emotional distress, separate and apart from any claims that she might have under Title VII. *Kassem,* 513 F.3d at 255.

In its March 28, 2008 decision, page 20-21, this Court did acknowledge the recent decision in *Kassem*, however, since that date, the D.C. Circuit Court of Appeals also decided *Khan v. Parsons Global Services, Ltd., --F.3d--,* 2008 WL 996510 (D.C. Cir. 2008). In *Khan*, the D.C. Circuit reversed the trial court's dismissal of the intentional infliction of emotional distress claims of both Mr. Khan, an employee of the defendant company, and his wife, who was not an employee. While stationed in the Philippines, Mr. Khan was kidnapped and tortured, including the severing of his ear, as proof that the kidnappers had him and would further harm him.

The Khans claimed that the employer mishandled the situation and was focused more on deterring future kidnappings than in paying the ransom and saving Mr. Khan's life. In the process, the Khans claimed that the defendant withheld information from Mrs. Khan that might

have permitted her to pay the ransom on her own. The district court found that the allegations

could not be considered "outrageous." The employer had no intent to harm Mr. or Mrs. Khan,

but was dealing with an extremely difficult hostage situation and reasonably excluded Mrs.

Khan from some information and decisions.[6] The Court of Appeals reversed and reinstated the

Khans' IIED claim. The court held that a jury must determine whether the employer's conduct

was reasonable or "outrageous." The Court of Appeals' recent decisions in *Kassem* and *Khan*,

placing the question of what is "outrageous" in a civilized society, provides particular support

for the restoration of Ms. Martin's IIED claim and its submission to a jury.[7]

> Specific intent to cause harm is not required. Reckless infliction of
> emotional distress is sufficient...Liability "extends to situations in which
> there is no certainty, but merely a high degree of probability, that the
> mental distress will follow, and the defendant goes ahead in conscious
> disregard of it."

Restatement, supra, § 46 comment i.

In defining "outrageous," the court should consider the nature of the activity,

the relationship between the parties, the duties of the parties, and the prevailing norms

of society. *Woodner v. Breeden*, 665 A.2d 929, 935 (D.C. Ct. App. 1995). "The extreme

---

[6] Specific intent to cause harm is not required. Reckless infliction of emotional distress is sufficient. Liability "extends to situations in which there is no certainty, but merely a high degree of probability that, the mental distress will follow, and the defendant goes ahead in conscious disregard of it. Restatement, supra, § 46 comment i.

[7] In her *Opposition to Defendant's Motion to Dismiss*, at 34-35, Ms. Martin pointed out inconsistencies between *Kassem* and another district court decision decided two months earlier, *Mintz v. District of Columbia*, 2006 WL 1518954 at *5-6 (D.D.C. 2006). Judge Oberdorfer permitted the plaintiff's intentional infliction of emotional distress claim against his former employer to proceed to a jury based on the following actions taken against him by his employer: The actions taken against Mr. Darbeau that could constitute intentional infliction of emotional distress are: 1) he was given one year renewable contracts, instead of permanent employee status; 2) he was denied certain training benefits; 3) his desk was placed in an undesirable, noisy, isolated location; and 3) finally, the employer failed to renew his contract, despite superior performance evaluations.The intentional infliction of emotional distress claim was not brought by the original named plaintiff, Mr. Mintz, but rather, by the second plaintiff, Selwyn Darbeau. Mr. Mintz prevailed on his *Motion for Summary Judgment* on his Title VII hostile work environment

and outrageous character of the Defendant's actions may arise from his abuse of a position

of authority over him, or power to affect Plaintiff's interests." *Harris v. Jones*, 281 Md.

560, 566 (Md. Dec 09, 1977, quoting *Restatement of Torts*, Section 46.

Because Ms. Meccariello had complete control over Ms. Martin's livelihood and

workplace, the emotional distress that she could -- and did -- inflict upon Ms. Martin was

severe.  Ms. Martin had to choose between becoming part of a system that abused

persons with mental disabilities while it was being paid to assist them, or to jeopardize

her ability to support herself and her teenage daughters.

**Ms. Martin's complaint consists of far more than being cursed at by her co-**

**worker;** yet the response of "F--k you, Lowry," clearly and concisely summarizes the

ARC's treatment of Ms. Martin and its callous disregard for both her and the people that

she was trying to help.

Ms. Martin had to perform the duties neglected by Ms. Graham, in order to prevent The

ARC's client, "Cartina,"[8] from losing the job that The ARC had just secured for her.  Compl. ¶

30.  Ms. Graham made an error regarding the starting date of the position for a client, Cartina,

and therefore failed to provide transportation for Cartina to her new job, as was necessary in

order for Cartina to secure and perform the job.  Compl. ¶ 31.  Ms. Martin saved Cartina's job

from termination by performing the required transportation to Cartina, using her own personal

vehicle, although it was not within her normal job duties to provide for a client for regular

work attendance.  Compl. ¶ 32.  See also **Exhibit 1** of *Pl's Opp. MTD*, Declaration of Donald

Exner, Esquire, attorney and guardian for Cartina; **Exhibit 2** of *Pl's Opp. MTD*, affidavit of

---

claim and was permitted to proceed to trial on his discharge claim.
  [8] The client's last name is omitted to protect the client's privacy in public records; however, the
ARC only had one client named "Cartina" while Ms. Martin was employed by the ARC.  The
client's full name will be provided to the Court, under seal, as appropriate.

Crispin O'Conner, Supervisor of Case Managers at MRDDA, the D.C. funding agency for the ARC, who supervised Gary Washington, case manager for Curtina.

In addition to providing transportation for Cartina to and from work for several days, Ms. Martin also performed the duties of "job coach" for Cartina, awaiting The ARC's assignment of a qualified job coach to assist Cartina. Compl. ¶ 33. Ms. Martin attempted to discuss with Ms. Graham the to transportation and job coaching problems caused by the confusion with respect to Cartina's starting date for her new position. Compl. ¶ 34. Ms. Graham responded to Ms. Martin's inquiry by dismissing her with the words, "F--k you, Lowry." Compl. ¶ 35. Ms. Martin responded to Ms. Graham by stating, "Now, Annetta, how unprofessional is that?" Compl. ¶ 36.

Ms. Graham had a practice of harassing Ms. Martin and thwarting Ms. Martin's ability to place clients in jobs and otherwise perform her job. Compl. ¶ 37. Ms. Graham scheduled a meeting in Ms. Martin's absence and did not inform her of the meeting, although Ms. Martin was a necessary party to the meeting. Ms. Martin alleged that Ms. Graham's failure to tell Ms, Martin about the meeting nearly cost an ARC client a job. Compl. ¶ 38. On or about July 14, 2004, Ms. Martin filed a Grievance with The ARC (Compl.Exhibit E), pursuant to The ARC's Grievance Procedures. Compl. ¶ 39.

Ms. Martin filed a Step 1 Grievance, pursuant to the written Grievance procedure, on July 14, 2004. In her four-page grievance, Ms. Martin alleged that Annetta Graham committed misconduct. Compl. Exhibit E. The actions alleged constituted both simple and gross misconduct by Ms. Graham, under ARC's stated discipline policies, §§10.2.1 and 10.2.2. Compl. ¶ 40; Compl. Exhibit C. Ms. Martin reported that Ms. Graham committed specific acts that constituted neglect of persons served by The ARC and abuse of persons, including verbal

harassment, in violation of § 10.2.1, defining "gross misconduct"  Compl. ¶ 42; Exhibit E.  The

Grievance stated that Ms.  Martin had to perform the duties neglected by Ms. Graham, in order

to prevent a client from losing a job.  Compl. ¶ 43; Compl. Exhibit E.   Ms. Martin further

reported that Ms. Graham scheduled a meeting in her absence and did not inform her of the

meeting, although Ms. Martin was a necessary party to the meeting, and that Ms. Graham's

failure to tell her about the meeting nearly cost Cartina her job.  Compl. ¶ 44.

 The ARC's written Personnel Policies, § 9.1-9.2, include a Grievance procedure.

Compl. ¶ 11, Compl. Exhibit C.  Ms. Martin reported Ms. Graham's conduct, asking that

action be taken to avoid similar problems in the future.  Compl. ¶ 10, Compl. Exhibit E.  Ms.

Martin's grievance also noted her own observations regarding conditions for the ARC's clients

that indicated that the ARC was not providing its clients with the services required under its

government funding agreements.  Compl. ¶ 15, Compl. Exhibit E.

 Ms. Martin included a "P.S." in her Grievance, which reads:

> I would like also to mention that quite a few of the clients identified by Ms.
> Graham and her staff in my opinion need to be re-evaluated in regard to
> employment.  As I feel they are really not ready to take on employment
> even with the support of a job coach, I can inform you of who they are if
> you wish, however I will try to place them.

Compl. ¶ 57.

 Ms. Martin's Grievance also reported her own "close" working relationship with Mr.

Washington, Cartina' case manager at MRDDA and her conversations with Mr. O'Conner, Mr.

Washington's supervisor, when Mr. Washington was not available, as well as with Cartina's

attorney and guardian, Donald Exner, Esquire.  Compl. Exhibit E. Ms. Martin explained how

she had to coordinate with all of them to save Cartina's job, since the ARC. Had provided no

job coach or transportation for Cartina and she was about to lose her job.  Compl. Exhibit E.  It

was Ms. Graham's duty to supply both the job coach and the transportation, but the ARC had not hired the requisite number of job coaches, so there was a shortage, in violation of the ARC's funding contract.

In response to her July 14, 2004 Grievance, Ms. Meccariello summoned Ms. Martin to a meeting on July 15, 2004, with Tom Dempsey and Annetta Graham present.   Compl. ¶ 47. Ms. Meccariello and Mr. Dempsey acknowledged that Ms. Graham had made an error regarding the employment starting date of a client and that Ms. Martin solved the problem by taking the client to his new job.  Compl. ¶ 48.  Ms. Graham denied that she told Ms. Martin, "F--k you, Lowry," but claimed that she told Ms. Martin, "Bump you, Lowry." Compl. ¶ 49. Ms. Meccariello told Ms. Martin that it was "ridiculous" that Ms. Martin had submitted "a four-page memo" of "he said, she said."  Compl. ¶ 55.

Whether Ms. Graham actually said, "F--k you, Lowry" or "Bump you, Lowry," in response to Ms. Martin's concerns about Ms. Graham's actions that nearly cost a client a job, Ms. Graham's conduct amounts to misconduct under The ARC's discipline policy.  Compl. ¶ 50.  Pursuant to The ARC's Grievance Policy, The ARC was required to process Ms. Martin's July 14, 2004 Grievance (Compl. ¶ 52); however, it never processed her Grievance.  Compl. ¶ 53.  Ms. Martin received no written response and no opportunity to progress to Step 2 or Step 3 in the grievance process, as required by the ARC's Discipline and Grievance Procedures in its Personnel Policies.  Compl. ¶ 54.

Ms. Martin attempted to discuss with Ms. Meccariello, Tom Dempsey and Annetta Graham her belief that The ARC was not fulfilling its obligations to its clients or to the funding government entities by leaving clients without work to perform, training while awaiting employment, or qualified job coaches during employment.  Compl. ¶ 62.  Ms. Martin told Ms.

Meccariello, Tom Dempsey and Annetta Graham that some ARC clients who await employment in ARC's waiting rooms have with major impediments to employment including, but not limited to, **the inability to control their excrement,** the inability to follow instructions, the inability to control calling out, and the inability to refrain from taking other people's property and keeping it.  Compl. ¶ 60.

Ms. Martin told Ms. Meccariello, Tom Dempsey and Annetta Graham that most of The ARC's clients were sitting at ARC, day after day, not receiving job training and not being placed.  Compl. ¶ 58.  Ms. Martin expressed her compassion for these clients and her belief that the clients would be better served spending the "waiting time" in a productive, rehabilitative environment, rather than sitting in the offices of ARC all day, day after day, without jobs (Compl. ¶ 59), leaving clients without work to perform, training while awaiting employment or qualified job coaches during employment.  Compl. ¶ 68.

On July 16, 2004, two days after Ms. Martin filed her grievance, she was again called to a meeting with both of her direct supervisors, Mary Lou Meccariello and Thomas Dempsey. Ms. Meccariello angrily chastised Ms. Martin for comments in the "P.S." of her Grievance regarding the ARC's provision of services, or lack thereof, for its clients, which the ARC was obligated to provide, pursuant to its federal and District of Columbia funding contracts. Compl. ¶ 14.   Ms. Meccariello specifically admonished her for raising the issue that The ARC was not providing proper employment evaluations of clients, job training or job coaching. Compl. ¶ 15.

Ms. Meccariello further angrily chastised Ms. Martin for purportedly discussing another ARC employee's neglect of her duties with Mr. Washington and Mr. O'Connor, of its funding agency, MRDDA.  Compl. ¶ 16.  Ms. Martin explained to Ms. Meccariello that Ms.

Graham had told Mr. Washington that she had left a message on Ms. Martin's cell phone voicemail about the meeting.  Ms. Martin truthfully explained that she did not neglect her duties, but that there was no message on her cell phone regarding the meeting.  Compl. ¶ 65. Ms. Martin could not respond to Mr. Washington's questions about the planned meeting because she had never been informed of it.

Ms. Meccariello told Ms. Martin that she should *never* indicate to a person outside of ARC that a co-worker had made a mistake because it reflects badly upon ARC.  Compl. ¶ 64. She ordered Ms. Martin never to speak to a funding agent about the operations of the ARC (Compl. ¶ 17) and accused Ms. Martin of not being a "team player."  Compl. ¶ 18.  Ms. Meccariello then fired Ms. Martin, during the meeting, with no warning or prior notice. Compl. ¶ 12, 56.  Ms. Meccariello told Ms. Martin she was being discharged because she was her "own person" and was a "mover and a shaker."  Ms. Meccariello told Ms. Martin that she admired these qualities, but that these qualities did not fit in at ARC.  Compl. ¶ 79.

Ms. Meccariello ordered Ms. Martin to clean out her desk within the following half hour.  Compl. ¶ 72.  When Ms. Martin told Ms. Meccariello that she needed more time than the time to sort out her belongings than half an hour, Ms. Meccariello told Ms. Martin that she would have to leave within half an hour, and could only return after 5:00 on Monday, rather than during regular business hours, to complete sorting out her belongings.  Compl. ¶ 73.

On July 19, 2004, the ARC sent Ms. Martin a letter stating that she was terminated, as of the date the letter was written, July 19, 2004.  No reason is stated, in the letter, for Ms. Martin's termination.  Compl. ¶ 74; Compl. Exhibit F.  The District of Columbia Unemployment Office specifically found that The ARC did not terminate Ms. Martin for "cause" or other misconduct; accordingly, Ms. Martin received Unemployment Compensation

Benefits after being terminated from The ARC.  Compl. ¶¶ 75, 76, Compl. Exhibit G.

While Ms. Martin was employed by the ARC, she placed ARC clients, persons with mental retardation, into jobs with employers that she had solicited.  Compl. ¶ 85.  Upon information and belief, after Ms. Martin was terminated from The ARC, there were ARC clients, persons with mental retardation, persons placed in jobs by The ARC for at least a year. Compl. ¶ 86.

Guardians for clients of the ARC praised Ms. Martin for her compassion and success in placing the ARC's clients in gainful and fulfilling employment, having previously been disappointed with the ARC's inaction.  *Pl's Opp. MTD*, **Exhibits 3, 4, 5 and 6**, affidavits of guardians of clients who were placed by Ms. Martin**.**  Ms. Martin was respected by her co-workers, regarded as a person who shared information and assisted other co-workers in helping the ARC's clients.  of *Pl's Opp. MTD*, **Exhibits 7 and 8,** affidavit of ARC co-workers**,** Arlene Johnson and Amy Cau**.**  The praise that she received from clients and co-workers while she worked at the ARC was consistent with the assessment of her work prior to joining the ARC. of *Pl's Opp. MTD***,** **Exhibits 9** (Ms. Martin's resume, collective references and work descriptions prior to joining the ARC) **and 10** Ms. Martin's awards and certificates of training in areas of job counseling and counseling persons with mental disabilities.  After her termination from the ARC, Ms. Martin was thwarted in her ability to obtain similar employment, despite her excellent references from previous employment.  of *Pl's Opp. MTD***,** **Exhibit 11**, collective references obtained after Ms. Martin's termination from the ARC.

Ms. Graham was eventually terminated for taking leave on false pretenses, i.e. claiming that her young son was having open heart surgery, when, in fact, her son was well and attending school.  Compl. ¶ 87.  Even after Ms. Graham was terminated, The ARC made no

attempt to re-hire Ms. Martin, although its leadership knew that Ms. Martin was still unemployed, in need of employment and sought reinstatement with the ARC.  Compl. ¶ 88.

Ms. Martin was damaged by her termination, financially and emotionally and with respect to her professional reputation.  After her termination, Ms. Martin has been unable to pay her basic costs of living for herself of her children, two of whom were still teenagers, with the oldest preparing to attend college.  Ms. Martin has accumulated substantial debt, and has been experiencing severe emotional distress.  Compl. ¶ 100.

A jury could well find it *unacceptable* and "*outrageous*," in a civilized society, to punish a conscientious employee for attempting to correct practices that are abusive to persons with mental disabilities,  particularly where the employer exists for the *sole purpose* of caring for and assisting those persons with disabilities.  It is precisely because persons with mental disabilities are one of the most vulnerable segments of the population that the ARC is provided with taxpayer funds to provide them with services that will make their lives more productive, meaningful and self-sufficient.   by keeping persons with mental disabilities confined to its facility, day after day, for no productive or recreational purpose, the ARC was actually making life *worse* for its clients, rather than better.

The beneficiaries of the funds were, therefore, only the persons whose salaries were being funded by the government.  Ms. Martin observed the ARC neglecting, abusing and exploiting the clients it existed to serve; and she tried to change it by bringing the problems to the attention of her supervisors, through direct conversation and through the ARC's own written grievance policy.   A jury could certainly conclude that the ARC's failure to remedy the situation and instead, to immediately fire Ms. Martin for

reporting the neglect and abuse by her co-worker, was "outrageous" and unacceptable in civilized society.

"Actions which violate public policy may constitute outrageous conduct sufficient to state a cause of action for infliction of emotional distress." *Howard University v. Best,* 484 A.2d 958, 985 (D.C. App. 1984), *modified on other grounds*, 547 A.2d 144 (D.C. App. 1988).[9]  In her Opposition to Defendant's Motion to Dismiss, Ms. Martin quoted Donald Exner, Esquire, the attorney/guardian for Cartina clearly found it "outrageous" that the ARC's demonstrated such callousness toward his client, Cartina, and discharged Ms. Martin, the only person at the ARC who helped her, effectively, *for* helping her.  (See Exhibit 1 of Opp,**[10]** Declaration of Donald Exner, Esquire.)  Mr. Exner summed up his sentiments in his final paragraph, ¶ 15:

> **I was very disappointed when I learned that Ms. Lowry Martin was no longer employed by D.C. ARC.  I believe that she was very sincere in getting Cartina into supportive employment.  As I said earlier, she was able to accomplish what no one else had accomplished for 14 ears, despite many promises to do so.  Now she is gone!  Who is going to help Cartina?**
>
> Reasonable jurors could share Attorney Exner's sentiments, once learning the

---

[9] See e.g., discussion of *Kassem*, above, adopting the holdings that same conduct that constitutes sexual harassment in the workplace may also constitute a claim for intentional infliction of emotional distress.  *Id.*

[10] See also exhibits 2-6 of Ms. Martin's *Opposition to Defendant's Motion to Dismiss* for additional commentaries on the difference that Ms. Martin made in the lives of persons with mental disabilities at the ARC.  For example, in her Declaration, Exhibit 3, ¶ 6.  Attorney Karen Kruger, guardian for another ARC client praised Ms. Martin for placing her client, after years of wrote:

> In the thirteen years I have known Milton, I have never seen him so happy or fulfilled.

Exhibits 4-6 are from additional guardians/parents of persons with mental disabilities with similar gratitude for Ms. Martin's contributions to their lives.

facts at trial. Ms. Martin therefore respectfully asks this Court to restore her IIED claim

and permit a jury to decide whether Ms. Meccariello committed "outrageous" and

unacceptable conduct when she refused to address her subordinate's neglect and abuse of

persons with mental disabilities entrusted to the ARC and terminated Ms. Martin, in

violation of public policy, for reporting the abuse and neglect.

**III.** **Plaintiff Respectfully Seeks Permission to Amend her Complaint to Include a Claim of Wrongful Discharge, in Light of _Kassem_ and Other Recent Wrongful Discharge Cases**

Because Ms. Martin filed her Complaint alleging wrongful discharge under the

False Claims Act, as a whistleblower, she was estopped from asserting a simultaneous

claim under a tort theory of wrongful discharge.[11]  Wrongful discharge claims are only

permitted where there is no statutory basis for a claim, but the discharge violates public

policy. *Elemary v. Holzmann*, --F. Supp.2d --, 2008 WL 316376 (D.D.C. 2008) at 14,

*citing Kassem*, 513 F.3d at 254-255.

The Court may consider an issue belatedly raised "where injustice might

otherwise result." *IRS v. Murphy*, 493 F.3d 170, 172 (D.C. Cir. 2007).   Now that the

Court has dismissed Ms. Martin's False Claims Act claims, there is no statutory basis for

her claim; however, the facts and arguments that she has set forth in her Complaint and

*Opposition to Defendant's Motion to Dismiss*, alleging wrongful discharge under the

False Claims Act, as well as her claims of IIED, have long placed the ARC on notice of

allegations that constitute the tort of wrongful discharge.

In *Franklin v. Monadnock Co.,* 151 Cal.App.4th 252 (Cal. 2007), the plaintiff's

co-worker threatened to have him and three other co-workers killed.  The plaintiff

reported the threats to his employer, but the employer did nothing. The co-worker then assaulted the plaintiff, outside of the workplace. The plaintiff reported the assault to the police and the employer. The employer then fired the plaintiff.

The D.C. Circuit, applying the law of the District of Columbia, also recognizes the tort of wrongful discharge.

> Whether a discharge violates public policy is determined on a case by case basis, guided by the concept that a wrongful termination cause of action must be firmly rooted in the Constitution or in a statute or regulation which reflects the particular public policy being relied upon.

*Elemary*, 2008 WL 316376 at *14, citing *Kassem*, 513 F.3d at 254-255.

The District of Columbia *Mentally Retarded Citizens Constitutional Rights and Dignity Act* of 1978, as amended, D.C. code 7-1301.02, *et seq*. was enacted to:

> [a]ssure that residents of the District of Columbia with mental retardation shall have all the civil and legal rights enjoyed by all other citizens of the District of Columbia and the United States.

D.C. Code 7-1301.02(a)(1).

The Act specifically prohibits the mistreatment, neglect or abuse of a person with mental retardation. D.C. Code 7-1305.10. Abuse is defined as:

> (1) any knowing, reckless, or intentional act or omission by a provider that causes or is likely to cause or contribute to, or which caused or is likely to have caused or contributed to, injury, death, or financial exploitation of a consumer.

D.C. Code 7-1231.02.(1). *See also* 7-1305.14. *Deprivation of civil rights; public or private employment; retention of rights; liability; immunity; exceptions.*

Ms. Martin's grievance with the ARC was firmly rooted in the District of Columbia *Mentally Retarded Citizens Constitutional Rights and Dignity Act.* The ARC

financially exploited persons with mental retardation.  The ARC received federal and D.C. taxpayer funds for the express purpose of helping them to be independent, productive, self-sufficient members of society.  Instead, they sat idle and helpless, day after day, *some even in their own excrement*.  The ARC's termination of Ms. Martin for refusing to participate in the ARC's violation of the *Mentally Retarded Citizens Constitutional Rights and Dignity Act* was a wrongful discharge, in violation of public policy.  She therefore respectfully requests that she be permitted to amend her Complaint to include a claim of wrongful discharge.

## CONCLUSION

Defendant's *Motion for Reconsideration* should be denied.  Plaintiff's claim of intentional infliction of emotional distress should be reinstated and she should be permitted to amend her complaint to add a claim of wrongful discharge, in violation of public policy.

Respectfully submitted,

Dawn V. Martin, Esquire
*Law Offices of Dawn V. Martin*
1725 I Street, N.W. Suite 300
Washington, D.C. 20006
(202) 408-7040 telephone
(703) 642-0208 *facsimile*
DVMARTINLAW@yahoo.com
www.dvmartinlaw.com

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

**Lowry Martin,**                                    )
               Plaintiff,                     )      Civil Action No. 05-01411
               v.                            )      EGS
                                                     )
**The ARC of the District of Columbia**   )
            Defendant.                     )
_____)

**ORDER**

Upon consideration of _Defendant's Motion for Reconsideration of the Court's Denial of its Motion to Dismiss Plaintiff's Breach of Contract Claim, Plaintiff's Opposition and Cross-Motion to Reinstate her Claim if Intentional Infliction of Emotional Distress and to Amend her Complaint to add a Wrongful Discharge Claim_, and the entire record herein, _Defendant's Motion to Dismiss the Complaint_, is **DENIED** and Plaintiff's Motion is **GRANTED**.

It is

**ORDERED:** that Plaintiff's Claim of Intentional Infliction of Emotional Distress is hereby reinstated; and

**FURTHER ORDERED:** that Plaintiff will have fourteen (14) days from the date of this Order to amend her Complaint to include a Claim of Wrongful Discharge.

**SO ORDERED.**

_____
The Honorable Emmet G. Sullivan
U.S. District Court for the District of Columbia